**PIASECKI AIRCRAFT CORPORATION, Island Road, International Airport, Philadelphia, Pennsylvania**

v.

**The UNITED STATES.**

**No. 522-78.**

United States Court of Claims.

Dec. 2, 1981.

---

Gilbert J. Ginsburg, Washington, D. C., for plaintiff. Kenneth B. Weckstein, Washington, D. C., attorney of record. Epstein Becker Borsody & Green, P. C., Washington, D. C., of counsel.

Gerald L. Elston, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant.

Before FRIEDMAN, Chief Judge, and BENNETT and SMITH, Judges.

## OPINION
### PER CURIAM:

This case comes before the court on requests for review, pursuant to Rule 54(b)(3), of the decision of Trial Judge Harry E. Wood, filed September 4, 1980, on the cross-motions of both parties for summary judgment. Upon consideration of the briefs and oral argument, this court concludes that Trial Judge Wood is correct, for the reasons given in his opinion, in denying plaintiff's claim that the default termination of its contract be converted to a termination for the convenience of the government. This court also agrees with Trial Judge Wood's decision that defendant's counterclaim for the return of progress payments be granted. We do not agree, however, that defendant is not entitled to interest on the unrepaid progress payments. A general interest clause, not called to the attention of the trial judge but part of the contract nevertheless, provides for such interest.

Accordingly, we adopt as the basis for our judgment those portions of Trial Judge Wood's opinion that deal with the merits of plaintiff's claim and defendant's counterclaim, and we substitute our own evaluation of defendant's claim for interest.*

## OPINION OF THE TRIAL JUDGE
### WOOD, Trial Judge:

In this action, before the court on cross-motions for summary judgment, plaintiff contends that a decision of the Armed Services Board of Contract Appeals sustaining the default termination of a contract (subsequently described) between plaintiff and defendant is defective under the familiar standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976).[1]

In general terms, plaintiff asserts that the default termination should be deemed a termination for the convenience of the government. More specifically, plaintiff contends that a number of Board findings are unsupported by substantial evidence, and that the Board erred as a matter of law in several respects in upholding the default termination.

---

* The court's substituted language starts with the seventh paragraph of Part III.

1. *Piasecki Aircraft Corp.*, ASBCA No. 18783, 78–1 BCA ¶ 12,886 (1977).

Defendant replies that the Board decision is entitled to finality. By way of counterclaim, it also asserts that it is entitled to judgment against plaintiff in the amount of $18,879, representing unliquidated progress payments to plaintiff pursuant to the terminated contract, plus interest thereon as provided by law.[2]

For the reasons, and under the circumstances, hereinafter set forth, it is concluded that plaintiff's petition should be dismissed, and that judgment should be entered for defendant on its counterclaim in the amount of $18,879 plus interest.

I

On March 5, 1973, plaintiff and defendant, acting through the Aviation Supply Office, Department of the Navy, Philadelphia, Pennsylvania ("ASO"), entered into a firm fixed price contract (Contract No. N00383–73–C–2410, sometimes hereinafter Contract 2410) pursuant to which plaintiff agreed to supply to defendant 867 banner tow targets at a unit price of $217.76 and a total price of $188,797.92.[3] The said targets (designated the "TDU–27C/B"), were to be furnished in accordance with Naval Air System Command ("NAVAIR") drawing number 487AS100–4, Revision A and Specification PS–TER21–1–A (ASO), dated June 1, 1972, captioned "Procurement Specification, Target, Tow, Aerial Banner TDU–27."

In the words of the specification, "the TDU–27C/B Aerial Target Banner * * * is used for air-to-air gunnery and rocketry". It consisted of a device for attaching the TDU–27C/B to a tow cable; a safety webbing assembly, having five nylon webbing straps 720 ± 2 inches (or 60 feet, ± 2 inches) long; a tow bar, to which the nylon webbing straps were attached; and a 7½-by 40-foot radar reflective banner panel.

The tow bar (a steel tube inserted in a loop or fold in front of the banner to keep the banner spread) was weighted at the bottom to keep the banner upright, and had a skid plate, also at the bottom, to prevent abrasion on takeoff of a tow aircraft. The specification described the banner panel only in terms of dimensions (and performance requirements), and how it was to be painted. All other components of the TDU–27C/B were detailed on Contract 2410's drawings.

Contract 2410 provided that, within 45 days from March 5, 1973 (*i.e.*, by April 19, 1973), plaintiff was to deliver five first article units to the Naval Missile Center, Point Mugu, California ("Point Mugu") for government testing. Specification PS–TER21–1–A(ASO)'s "Scope of Tests" clause provided that first article inspection should include all tests deemed necessary by "the procuring activity" to determine that the banner target met all contract requirements, and its "First Article Inspection" clause provided, among other things, as follows:

4.3.3.2.4 *Fraying and Ripping*—The target shall be examined for conformance to the requirements of 3.5.4. Contract 2410 also provided that:

3.5 *Performance Requirements*—Unless otherwise specified, the Target Assembly shall meet all the requirements set forth herein.

3.5.1 *Mission*—The target shall be capable of withstanding a mission which shall consist of a ground drag launch, a minimum of one and one-half (1½) hours of towed flight at 10,000 to 30,000 feet altitude at speeds up to and including 220 KIAS (Knots Indicated Air Speed) and the terminal phase of aircraft release of the target at an altitude and velocity not to exceed 500 feet and 175 KIAS, and shall meet all the requirements of 3.5.

\* \* \* \* \* \*

3.5.4 *Fraying and Ripping*—The panel, except for the trailing edge, shall not experience any fraying or ripping during

---

**2.** This issue was presented to, but not decided by, the Board; its opinion recites, but does not otherwise mention, defendant's said claim.

**3.** The facts stated herein were found by the Board or are properly derived from the administrative record. *See Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, —— n. 3, 609 F.2d 462, 467 n. 3 (1979).

the mission life of the Target Assembly (See 3.5.1). The trailing edge fraying or ripping shall not exceed two (2) feet.

At this point, some historical digression is helpful to understanding. From about 1957 to 1970, the Department of the Navy utilized 7½- by 40-foot targets in the Aero 35 series. The Aero 35 target was developed in about 1957 by Massillon-Cleveland-Akron Sign Company ("MCA"). Defendant acquired data rights in, and purchased a large number of, these targets. Following a July 1959 modification in the towing bridle, the target was redesignated the Aero 35A. Metalized nylon marquisette cloth with a vinyl coating was used in the Aero 35A banner panel. Both the Navy and the Air Force used the Aero 35A target.

In 1960 MCA developed another material which was incorporated into a target designated the Aero 35B. These targets displayed excessive fraying characteristics,[4] however, and experience and comparison flights demonstrated that the Aero 35A target was far superior to the Aero 35B. In February 1964, the Aero 35A target became the standard Navy target. The specification for the final Aero 35A contract noted in the record (awarded to MCA in April 1964) required that the target be flown at 220 knots indicated air speed ("KIAS") at an altitude of 20,000 feet for an hour with less than 5 feet of fraying.[5]

In 1964, plaintiff developed an experimental target which was flown by the Navy at 250 KIAS at an altitude of 20,000 feet for an hour and 20 minutes; the target frayed less than 2 feet. On December 4, 1964, plaintiff was awarded a contract to furnish to defendant 2,000 of these targets (designated the Aero 35C) to be made to a Piasecki part number. Production targets were not as successful as the experimental one, but, after improvements in production techniques and quality control, the Navy considered them superior to the Aero 35 series targets.[6] Between 1964 and 1969, plaintiff sold over 6,000 Aero 35C targets to the Navy. The performance requirement in the seven contracts covering those targets was that a banner fray no more than 5 feet when towed 1 hour at 220 knots at an altitude of 20,000 feet.

The banner panel for the Aero 35C target was made of 420 denier[7] nylon fibers woven into cloth using a two end leno[8] weave (described as "fairly tight"), and was uncoated. The Aero 35C target had a safety webbing assembly consisting of five nylon webbing straps "98.0′ ± 12″ long"; one of plaintiff's drawings noted that all assembled straps were to be tagged and marked with the proper length to the nearest ½-inch, and plaintiff tried to make each safety webbing assembly as uniform as possible by selecting straps for it within a tolerance of ½-inch.

In 1969 or early 1970, the Navy decided to design its own 7½- by 40-foot aerial tow target. The Navy designed target (designated the TDU–27C/B)[9] was, with some modifications hereinafter noted, the same target to be furnished by plaintiff pursuant to Contract 2410.

The Navy design used a safety webbing assembly 60 feet in length (as had at least some of the earlier Aero 35 series targets),

---

4. At that time, "the requirements of service for these targets were for speeds up to 240 knots * * * with fraying loss not over 2 feet." Limited fraying would permit reuse of a target, and was desirable from an economic standpoint.

5. The Board stated that "The tow harness on the Aero 35 banners was 60 feet long." In context, however, that finding plainly did not include the Aero 35C banner subsequently described herein.

6. In November 1965, some 32 of the last 100 targets made under plaintiff's first production contract were flown at 220 KIAS at an altitude of 20,000 feet for 1.4 hours; they frayed approximately 2 feet. Three others, which had been produced earlier, were also flown at the same time; two performed as well as the later produced ones, while one failed by ripping.

7. Denier is the weight in grams of 9,000 meters of yarn.

8. Two end leno is a weave in which pairs of warp yarns cross one another and thereby lock the filling yarn in position.

9. The specification for the TDU–27C/B target was designated PS–TER–21–1.

rather than the 98-foot ($\pm$ 12 inches) long assembly used in the Aero 35C targets.[10] A requirement that the target banner panel fray no more than 2 feet when towed at 240 KIAS at an altitude of 20,000 feet for 1.5 hours was written into the specification for the new target. Design of the banner panel was left to the manufacturer of the target; the Navy made no effort to design a banner fabric. The Navy believed that, with new materials and advances in technology in the considerable time that had passed since the design of the Aero 35 series, the new fraying requirement was feasible, but no tests to verify that this requirement could be met were performed.

A solicitation based upon the new Navy design resulted in a November 9, 1970, award of a contract to Warrior Manufacturing Company, Inc. ("Warrior"), for 897 TDU–27C/B targets.[11] Warrior made several submissions of first articles which failed badly to meet the performance requirements of its contract. At Warrior's suggestion, several modifications were made in the contract. Among other things, the safety webbing assembly, as modified, was to have five straps, rather than the four originally called for. Box X stitching "in lieu of the specified stitching" was also prescribed and the test flight speed stated in Warrior's contract was reduced from 240 to 220 KIAS.

The last unit of the first articles submitted by Warrior was tested at the reduced flight speed and met the contract fraying requirement except at one corner (where it frayed 2½ feet). The Navy considered Warrior's target acceptable; Warrior completed its contract, and the Navy accepted and used Warrior's targets. The Board found that Warrior's targets, "when properly made, did not always meet the 2 foot maximum fraying requirement, but were close enough to be usable", and that those targets "were at least equal in fraying qualities to [plaintiff's] Aero 35C targets." [12]

Parenthetically, during contract performance, and in a response to a Navy deficiency report, Warrior asserted in substance that the specified length of the safety webbing assembly (60 feet, rather than the 100-foot length said by Warrior to have been used in the Aero 35B target), led to an unstable flight of the banner which increased the rate of fray; Warrior suggested (among other things) that the length of the TDU–27C/B's safety webbing assembly be increased to 100 feet. In the Board's words, "The record does not show the disposition of the above message; however, no change was made in the length of the tow harness. The Navy's own investigation revealed that the inferior quality of the production targets was due to manufacturing errors * * *."

In December 1972, ASO issued a second invitation for bids on the TDU–27C/B target. The Navy's "plan and specifications", as modified during the Warrior contract (with two exceptions),[13] were a part of the December 1972 invitation. Plaintiff was

---

10. The shorter safety webbing assembly would be cheaper than the longer one, and "harness length was not believed to affect performance of the target."

11. Plaintiff submitted a bid in response to the solicitation leading to the Warrior contract, and knew the contract "performance requirements and design."

12. Cf. n. 6, supra. The cloth Warrior used in its banner panels was not described in detail in the administrative record, but the Board stated (on the basis of "poor quality Xerox copies of photographs and * * * a laboratory report") that "it was a very open weave marquisette of relatively heavy nylon threads." That statement is unchallenged here.

13. The Board noted only one such exception, a ballast change of no moment here. The other (the box stiching change to the Warrior contract noted above) was, as plaintiff says, overlooked at one point administratively (although recognized elsewhere in the Board opinion). Any error is, however, completely harmless. On April 18, 1973, plaintiff requested a deviation in the specified safety webbing assembly stitch pattern (to box stitching); Modification No. P0003, dated April 30, 1973, granted the request, extended the delivery date of first articles to May 3, 1973, and extended the delivery date of production units to August 16, 1973. Plaintiff delivered first articles to Point Mugu on May 3, 1973.

the low bidder, and, as noted at the outset, was awarded Contract 2410 on March 5, 1973.

Between 1970, when the Warrior contract was awarded, and 1973, when Contract 2410 was awarded, both ASO's buyer and its contracting officer for aerial tow targets had changed. The contracting officer on plaintiff's contract was unaware of the quality of Warrior's performance, or of problems with Warrior targets; he was also unaware that the Navy had not tested a prototype of the TDU–27C/B target. Plaintiff did not ask the Navy whether such testing had been done. In issuing the invitation for bids that led to Contract 2410, the Navy did not advise plaintiff that Warrior had failed to meet the fraying requirement in its first article tests, and plaintiff did not ask the Navy whether or not Warrior had met that requirement.

Warrior's contract had required it to deliver to the Navy a detail specification for the material used in its banner panel, and had given the Navy the right to use that data in future procurements.[14] Plaintiff was, however, manifestly aware that Contract 2410 not only did not specify the banner material to be used in contract performance, but essentially described it only in terms of performance requirements. Nothing in the administrative record indicates that plaintiff knew, or even inquired about, the nature of the material in Warrior's banner panel (or, for that matter, why the banner material was described as it was).

In preparing its bid on what became Contract 2410 (and in commencing contract performance), plaintiff intended to use the 420 denier, two end leno, cloth used in the Aero 35C target (which nearly met the performance requirements contained in Contract 2410) with updated technology. Subsequent to bidding, however, plaintiff decided to double the denier of the nylon (to 840

denier) on the assumption that doubling the denier would nearly double the strength of the cloth, and to use a three end leno weave. The Board found that "This should have, and probably did, better lock the warp and filling threads at the joints."

Plaintiff timely delivered the first articles required by Contract 2410 to Point Mugu on May 3, 1973. The first test flight of the first article was aborted when the tow cable broke. The second and third test flights were made May 29 and June 11, 1973; during each flight, the banner being tested frayed about 10 feet from the trailing edge, and the tow bar used in the test permanently bent.[15] A fourth test flight, using a tow bar of stronger steel, took place on July 19, 1973; the banner frayed about 10½ feet when flown for 40 minutes at 220 KIAS and at an altitude of 20,000 feet. The first article targets failed substantially to meet the 2 feet maximum fraying requirements of Contract 2410.

At this point, it is again desirable to digress chronologically. In September 1972, Point Mugu had been tasked to develop an optimum design for future TDU–27 target contracts; among other things, studies were to be made of textile technology, especially materials and processes for banner targets. Point Mugu examined and tested (among other materials) a sample of a nylon woven fabric, silver metal coated, then coated with a white vinyl polymer, submitted January 17, 1973, by Swift Textile Metalizing and Manufacturing Corporation ("Swift"), of Hartford, Connecticut. The Swift material appeared to be the same as a sample MCA had submitted to Point Mugu in August 1972.

On May 3, 1973, the day plaintiff delivered its first articles under Contract 2410, plaintiff was advised that MCA had an interesting target at Kingsville, Tennessee,

---

14. Plaintiff had submitted an unsuccessful bid on the Warrior contract, and was thus familiar with its requirements.

15. The Board found that these tow bars "had been made by the optional use of SAE 1025, a low strength steel. This was admittedly a defective specification." It also found, however,

that targets with tow bars that deformed, "obviously causing unequal stress on the banner, frayed less than the one with the tow bar which did not deform." Plaintiff does not challenge these findings. Its legal arguments based on tow bar design will be treated hereinafter.

that plaintiff should see. When plaintiff's president called Point Mugu to ask for the source of the material in the MCA banner, he was told that the material had been made by Swift or Swift Mills, and that this company was somewhere in the south. A search of the southern grouping of the Textiles Blue Book revealed no Swift Mills, but plaintiff did find a Southern Phoenix Weaving. That company had at one time been known as "Swift Textiles". A call to Southern Phoenix left the impression that it had a material as described, and plaintiff thereupon ordered a sample of that material.

On May 7, 1973, plaintiff's president witnessed a flight test of the MCA target at Kingsville. That target met the performance requirements of the TDU–27C/B specification. Plaintiff's president made an impression of the cloth in the banner panel, and plaintiff immediately began an effort to develop a similar fabric of its own. On May 15, 1973, a representative of plaintiff received from Point Mugu a sample of the Swift material.[16] The next day plaintiff received a sample from Southern Phoenix. Comparison of the impression of the MCA banner with the Swift material showed that both were the same weave; comparison of the Southern Phoenix sample with the impression of the MCA banner and the Swift material showed the former to be different.

On June 20, 1973, plaintiff was formally notified that its first articles had failed to meet contract performance requirements, and was requested to advise the contracting officer, in writing, as to "the corrective action you propose to take, i.e., the type of material, cloth and bar, you will use on additional samples to correct deficiencies * * *" should the Navy request a resubmission of first article samples.[17]

On June 29, 1973, plaintiff learned from Point Mugu the full name and address of Swift. Plaintiff called Swift and, on July 5, 1973, visited that company in Hartford. Plaintiff was given a price for Swift material, and informed that delivery was based on a North Carolina mill at 2,000 yards per week, starting in 6 to 8 weeks.[18] On July 17, 1973, plaintiff's president again called Swift to ascertain whether any material was immediately available, and was told that 3 days earlier all available material had been sold to the Navy (Point Mugu). The July 14, 1973, purchase was of 300 yards of material; the Navy's decision to purchase, because of an urgent need for 10 targets for a training command, had been made July 11, 1973.

During plaintiff's contacts with Swift, it also started to develop its own cloth and coating. The Swift material was nylon marquisette superdupe weave (a term not explained in the record); plaintiff was familiar with this weave, and learned that its regular weaver could make it. Plaintiff selected 520 denier yarn because it was available and appeared to be what Swift had used. After study and trial of several coatings, plaintiff selected one applied with a roller. On July 31, 1973, plaintiff placed an order for this material with its mill.

Plaintiff had advised ASO of its effort to develop a new banner panel material, and at a July 26, 1973, meeting, had given to the contracting officer samples of the banner material it would use if permitted to continue contract performance. At that meeting, however, plaintiff refused to guarantee that either its new material, MCA material, or a material similar to (but cheaper than) MCA's, would meet Contract 2410's performance specifications. Plaintiff stated

---

**16.** On June 29, 1973, Point Mugu tested a target of the Swift material, and two targets submitted by MCA. Although the MCA targets frayed extensively during a 20-minute flight, the Swift target, flown 90 minutes at 240 KIAS and at an altitude of 15,000 feet, lost only 3 inches of fabric on each corner due to fraying.

**17.** This notification antedated the July 19, 1973, target test flight described above. In response,

plaintiff requested a meeting. The requested meeting occurred July 26, 1973, at ASO. The Board erred in dating the meeting 4 days later.

**18.** The record does not indicate that plaintiff placed an order with Swift at that time, nor does it reflect that any effort to obtain material for a sample target was then made.

that, since either material was more expensive than plaintiff's first article material, the contract price would have to be renegotiated upward. The Navy decided that plaintiff could not successfully perform, and offered plaintiff a no-cost termination of the contract, with all progress payments to plaintiff to be returned to defendant. By letter, dated August 6, 1973, plaintiff rejected the no-cost termination proposal, and on August 17, 1973, Contract 2410 was terminated for default. Plaintiff timely appealed from the default termination, but that termination was upheld by the Board. This action followed.

## II

Plaintiff asserted administratively that contract performance was impossible and that plaintiff did not assume the risk of such impossibility of performance; that the Navy's safety webbing assembly design was defective, in that it caused the TDU–27C/B target banner to fray in excess of 2 feet; that defendant failed to disclose to plaintiff its superior knowledge of vital information affecting contract performance; and that defendant interfered with plaintiff's ability to procure banner materials meeting the contract performance requirements. In consequence, plaintiff argued, its first article failure was excusable, the default termination was premature and improper, and the said termination should be converted to a termination for the convenience of the government. The Board rejected each of plaintiff's contentions.

Plaintiff's factual and legal challenges to the Board decision will be discussed seriatim, albeit not in the precise order in which they have been advanced by plaintiff. In the process, the essence of each such contention (as the trial judge understands it), rather than plaintiff's precise phrasing of that contention, will be stated.

**19.** In fact, targets with tow bars of SAE 1025 (which deformed) actually frayed less than a target with a stronger tow bar (which did not deform).

## A

The contention that the Board erred in not holding that failure of plaintiff's first articles was due to defective design.

Plaintiff asserts, in substance, that "two particular defects" in the specification for Contract 2410 "made it more difficult for Plaintiff to perform its contract", and that default termination "without allowing Plaintiff * * * additional time in which to perform was improper." In support of this assertion, plaintiff points specifically to defendant's target tow bar and safety webbing assembly designs.

Insofar as Contract 2410's specification permitted "the optional use of SAE 1025, a low strength steel", the specification was "admittedly defective". On the record before it, however, the Board found no evidence that this design defect had anything whatever to do with the failure of plaintiff's first articles.[19] All else aside, that finding, unchallenged here, is supported by substantial evidence. Accordingly, it is both deserving of finality and, with respect to the claim that first article failure was attributable to a defective tow bar design, dispositive.

Plaintiff's focus on the design length of the safety webbing assembly is no more availing. The Board carefully enumerated and weighed the evidence of record on the issue of the effect of a 60-foot (as distinguished from a 98-foot) safety webbing assembly on banner fraying. The Board found that plaintiff had failed to establish that "the difference in stresses imparted to the banner by the two harness lengths makes a material difference in the fraying of the banner * * *,"[20] and held that plaintiff had failed to prove "that the 60 foot length constitutes a defect in the specification." No valid ground for overturning either the Board's finding or its conclusion as defective under Wunderlich Act standards has been advanced by plaintiff, and none is apparent.

**20.** This finding is not among those listed in plaintiff's enumeration of findings deemed not supported by substantial evidence.

## B

The claims of inadequate testing, and the Navy's failure to specify the banner material to be used.

Plaintiff further asserts that in consequence of inadequate first article testing "it can not be found that the first article failures were evidence of Plaintiff's inability to perform", and that "the silence of the specifications with respect to banner material is yet another defect."

■ Neither of these assertions was raised during the administrative hearing, and no reason for permitting plaintiff to raise them for the first time here appears. *Conrac Corp. v. United States*, 214 Ct.Cl. 561, 573, 558 F.2d 994, 1000 (1977); *William F. Klingensmith, Inc. v. United States*, 205 Ct.Cl. 651, 665, 505 F.2d 1257, 1265–66 (1974). *American Electric Contracting Corp. v. United States*, 217 Ct.Cl. 338, 579 F.2d 602 (1978), relied upon by plaintiff as standing for the proposition that the court may consider these issues notwithstanding, is sharply distinguishable; the factors which prompted consideration of a newly raised issue on the merits in that case are not present in this one.

■ More importantly, however, neither assertion has any validity. The alleged first article testing inadequacy rests on speculation as to what defendant "could" or "may" have done. And, having bid on Contract 2410 with knowledge that its specification left to the successful bidder the decision as to what type of banner material it would use, plaintiff may not now be heard to say that description of the type of material only in terms of dimensions and performance requirements amounted, in and of itself, to a defect in the specification.

## C

The contention that the Board erred factually and legally in failing to hold that defendant breached its duty to disclose superior knowledge of vital information affecting contract performance.

In *Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 443–44, 312 F.2d 774,

778 (1963), the court noted that "an end-product specification normally leaves it to the contractor to perform as best he can * * * ", but held, that where defendant possessed vital information which it was aware bidders needed but would not have, it "could not properly let them flounder on their own." *Ibid.* The court added, however, that defendant was not necessarily required to volunteer all of its information, and that the scope of required disclosure would depend on, *inter alia*, the significance of the particular information to the performance of the contract. *Id.*, 160 Ct.Cl. at 446 n. 2, 312 F.2d at 779 n. 2.

■ The "decisive elements" in *Helene Curtis Indus., Inc. v. United States, supra*, were "the intentional withholding by defendant, of superior knowledge which the contractor could not be expected to obtain from other sources * * * ", *and* that the "special" knowledge withheld was "vital to the successful completion of the contract * * *." *H. N. Bailey & Associates v. United States*, 196 Ct.Cl. 166, 177–78, 449 F.2d 376, 382–83 (1971); *see also Hardeman-Monier-Hutcherson v. United States*, 198 Ct.Cl. 472, 487, 458 F.2d 1364, 1371–72 (1972). A mere governmental failure to disclose each and every bit of information it has clearly is not, in and of itself, enough to serve as a basis for contractor recovery. *Ibid; see also Firestone Tire & Rubber Co. v. United States*, 214 Ct.Cl. 457, 480, 558 F.2d 577, 589 (1977).

■ Plaintiff contends that the Board erred in failing to hold that defendant breached its duty to disclose vital information plaintiff did not have, and which defendant knew or should have known plaintiff did not have. Plaintiff assigns specifically defendant's failure to inform plaintiff that the TDU–27C/B had not been "successfully prototyped"; that Warrior's targets did not consistently meet the 2-foot fraying requirement; that Warrior had recommended that the safety webbing assembly length be increased to 100 feet; that defendant "was engaged in a banner specification development program to correct de-

sign defects in the TDU–27C/B target";[21] and that, at the time of contract award, defendant was unaware of any banner material that would meet contract performance requirements.[22]

Plaintiff's claim of breach in consequence of defendant's failure to disclose rests in large part upon plaintiff's challenges to allegedly defective Board findings.

Among other things, the Board found that plaintiff had failed to establish that it had substantially relied upon Warrior's performance in bidding on Contract 2410 "without knowing or asking with what Warrior performed";[23] that defendant had no knowledge of banner materials superior to the knowledge of plaintiff; that the only knowledge defendant had that plaintiff did not have was the fact that Warrior's TDU–27C/B targets would not consistently meet fraying requirements, and that since plaintiff did not contemplate using Warrior fabric, giving plaintiff that information would not have aided plaintiff's performance; that defendant disclosed to plaintiff, in a timely fashion, all information in its possession that would aid plaintiff's performance, and that defendant neither "possessed superior knowledge vital to performance, which it failed to disclose" nor issued Contract 2410 "with full knowledge of extreme difficulty of performance if such was indeed possible, while remaining silent, thus betraying the contractor into a disastrous bargain."

Having considered the administrative record, and plaintiff's attacks upon the Board's findings of fact, there is "no doubt that there was substantial evidence before the ASBCA as might convince a reasonable man to support the conclusions reached by that tribunal." *H. N. Bailey & Associates v. United States, supra,* 196 Ct.Cl. at 185, 449 F.2d at 387. Accordingly, the Board's findings are deserving of, and must be accorded, finality.[24]

In light of the foregoing resolution of plaintiff's factual challenges to the Board's findings and conclusions respecting plaintiff's superior knowledge argument, its attack on the Board holding of no breach of duty to disclose superior knowledge vital to contract performance also fails. *H. N. Bailey & Associates v. United States, supra.* The Board decision on this issue abundantly withstands scrutiny under the appropriate criteria, and should therefore be sustained.

### D

■ The claim that governmental "interference with Plaintiff's performance entitled Plaintiff to additional time in which to submit acceptable first articles."

Plaintiff asserts that defendant breached its "implied obligation * * * not to willfully or negligently interfere with the contractor in the performance of his contract" (*Peter Kiewit Sons' Co. v. United States,* 138 Ct.Cl. 668, 674, 151 F.Supp. 726, 731 (1957)), in two

---

**21.** This quotation from plaintiff's brief misstates the record. The Board found no more than that, in September 1972, Point Mugu was assigned the task of developing an optimum design for the TDU–27C/B for future contracts, including studies of materials and processes for banner targets.

**22.** The Board found that in March 1973 "no target had been tested which would *consistently* meet the fraying requirements of the contract." (Emphasis supplied.) That finding is supported by substantial evidence.

**23.** Plaintiff's argument that inquiry of Warrior, a competitor, would have been inappropriate is unpersuasive; the evidence does not reflect that plaintiff made any inquiry of *defendant* about Warrior's performance. To plaintiff's knowledge, defendant had purchased the banner specifications from Warrior with the right

to use them in future procurements, yet banner material was not specified in the invitation for bids on Contract 2410. Surely, if plaintiff relied on Warrior's performance, some inquiry was appropriate.

**24.** Although defendant was aware of (and did not disclose to plaintiff) Warrior's suggestion that the safety webbing assembly length be increased to 100 feet, that the TDU–27C/B had not been prototype tested, and that Point Mugu was engaged in developing an optimum design for the TDU–27C/B for future targets, these facts plainly do not deprive the Board findings of finality under Wunderlich Act standards. *See Specialty Assembling & Packing Co. v. United States,* 174 Ct.Cl. 153, 174, 355 F.2d 554, 567 (1966).

respects: first, by giving plaintiff, on May 3, 1973, "the incorrect name and location" of Swift Textile Metalizing and Laminating Company, of Hartford, Connecticut; second, by purchasing from Swift, on July 14, 1973, Swift's "entire stock of * * * banner material * * *." [25]

That plaintiff did not receive entirely accurate information about Swift's name and address on May 3, 1973, is clear. By May 16, 1973, however, plaintiff had become aware that the sample it had received from Southern Phoenix (formerly known as Swift Textiles) differed from both a Swift sample and MCA's banner material. So far as the Board record reflects, plaintiff made no further attempt to track down Swift's correct name and address until June 29, 1973, when it asked for and received that information from Point Mugu. Plaintiff did not actually seek to purchase Swift material for a sample banner until July 17, 1973, despite ample opportunity to do so earlier if it really wished to make a banner from that material.

The assertion in this court that defendant negligently prevented plaintiff from obtaining Swift material by not disclosing Swift's correct name and address until after such material had become unavailable is simply not so. And, the allegation here that, but for defendant's purchase of 300 yards of Swift material, plaintiff "would have been able to manufacture and deliver production units * * *" which met contract performance requirements has no more validity. The Board conclusions, that any delay resulting from the mix-up over name and address had no material impact on plaintiff's performance, and that the Navy's July 11, 1973, decision to purchase 300 yards of Swift material did not interfere with plaintiff's contract performance, are correct as a matter of fact and law, and are accordingly upheld.

**E**

■ The claim that defendant waived any right it might have had to terminate Contract 2410 by encouraging plaintiff to make a second submission of first articles.

Plaintiff contends that the August 17, 1973, default termination is improper because defendant, "by its conduct, waived any right it may have had to terminate the contract for default—prior to the Plaintiff's submission of a second set of first articles."

In the first place, plaintiff did not raise this argument administratively. *Cf. Conrac Corp. v. United States, supra; William F. Klingensmith, Inc. v. United States, supra.* Secondly, and more importantly, nothing in the administrative record justifies plaintiff's allegation that defendant "encouraged the Plaintiff to begin manufacturing a second set of first articles", or serves as a basis for invocation of the doctrine of waiver. Thirdly, *Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 386 F.2d 855 (1967), the sole authority cited by plaintiff in support of this argument, fails to support it. The argument must be, and is, rejected.

**F**

The claim that Contract 2410 was commercially impracticable.

Plaintiff contends that the Board erred in holding that Contract 2410 was not "impossible * * * of performance at the time the contract was entered into". Board findings not challenged by plaintiff adequately refute this contention.

First, many of plaintiff's Aero 35C targets, similar in function and design to the TDU–27C/B (but having a longer safety webbing assembly) had frayed approximately 2 feet when flight tested at 235 KIAS in late 1965. Second, although Warrior targets built to (and tested against) specifications essentially identical to those in Contract 2410 did not always meet the 2-foot fraying requirement, those targets

25. The purchase involved 300 yards of material urgently needed by the Navy. The Board found no evidence that "the purchasers [of the Swift material] knew they were depriving [plaintiff] of the opportunity to secure a sample of the cloth." That finding, challenged by plaintiff, clearly withstands scrutiny. In fact, plaintiff had received a sample of Swift material, from defendant, in May 1973.

were, when properly made, "close enough to be usable." Third, Warrior completed its contract, and the Navy accepted and used its targets. Fourth, and most significantly, it "was certainly possible to meet the performance requirements * * *" of plaintiff's contract, using a 60-foot long safety webbing assembly, for both MCA and the Navy (using Swift material) did so.[26] *See Jennie-O Foods v. United States*, 217 Ct.Cl. 314, 330, 580 F.2d 400, 410 (1978); *Astro Space Labs, Inc. v. United States*, 200 Ct.Cl. 282, 300, 470 F.2d 1003, 1013 (1972).

Plaintiff also asserts Board error in failure to hold that Contract 2410 was "impracticable" of performance. That doctrine, however, "is not invoked merely because costs have become more expensive than originally contemplated", but "may be utilized only when the promisor has exhausted all its alternatives, when in fact it is determined that all means of performance are commercially senseless"; and, the burden of proof in this respect is upon plaintiff. *Jennie-O Foods, Inc. v. United States, supra*, 217 Ct.Cl. at 328, 580 F.2d at 409.

The Board not only did not make findings requisite to sustain plaintiff's claim of commercial impracticability but, by clear and necessary implication, found that no showing of such impracticability had been made.[27] Plaintiff's arguments fall far short of establishing that, in this Wunderlich Act review, the court should overturn the Board's view of the record, or make findings not made administratively.

In light of the foregoing, it cannot be concluded that the Board erred factually or legally in rejecting plaintiff's arguments of impossibility (or commercial impracticability) of contract performance.

26. Plaintiff itself, some time after the termination of Contract 2410, made banners (using a 520 denier marquisette nylon, coated, material) which were successfully flight tested at Point Mugu. Moreover, plaintiff's industrial engineering manager testified that some targets with 420 denier material frayed less than 2 feet during April 1973 test flights.

27. The single "thing new in the successful targets was the use of 520 denier nylon"; all other technology used in successful banner material

### G

The claim that, even if the default termination should be sustained, plaintiff is entitled to an equitable adjustment for constructive changes.

Plaintiff nakedly asserts that the acts of which it "complains constituted constructive changes to the contract", that in consequence of each such act it incurred increased costs of performance, and that, whether or not the default termination is sustained, it is accordingly entitled to recover such costs by way of equitable adjustment. This line of argument is unsupported by reason, logic, or authority,[28] and cannot be sustained.

### H

The claim that the default termination was improper.

Each of plaintiff's challenges to the Board decision as factually and legally defective has been considered and found to have no merit. Accordingly, it is concluded that the Board decision should be affirmed.

### III

There remains defendant's counterclaim for $18,879, "with interest thereon as provided by law."

Clause L–1258, "Progress Payments for Small Business Concerns", made a part of Contract 2410, provided in pertinent part that "If this contract is terminated pursuant to the clause entitled 'Default' (i) the Contractor shall, upon demand, pay to the Government the amount of unliquidated progress payments * * *." Defendant as-

"had been known for many years." Moreover, the record failed to show that Swift's and MCA's use of 520 denier nylon "followed a development effort." These findings are not disputed by plaintiff.

28. *Teitelbaum v. United States*, 198 Ct.Cl. 150, 458 F.2d 72 (1972), cited in support of this contention in plaintiff's reply brief, dealt with different questions, and is entirely inapposite here.

serted administratively that plaintiff had been paid $18,879 pursuant to the progress payments clause, and that, notwithstanding demand, plaintiff had not repaid the amount demanded. Defendant "requested that the Board sustain this claim * * * in the total amount of $18,879, plus interest of 7¾% per annum, from * * * " August 17, 1973, the date of defendant's demand for repayment.

Before the Board plaintiff admitted (and in response to defendant's counterclaim in this court plaintiff again admits) that, during contract performance, plaintiff received $18,879 in progress payments and that, notwithstanding an August 17, 1973, demand for repayment, the said sum has not been repaid to defendant. The Board noted defendant's demand, but did not rule upon it. Why this is so does not appear.

 Plaintiff suggests that the court should view the Board's failure to rule in favor of defendant as a holding that defendant was not entitled to recover on its counterclaim. Defendant's response is that the Board did not deny its request, and that since the Board properly upheld the default termination, the court should recognize defendant's right to recover on the counterclaim in this forum.

In view of the silence of the Board opinion on the demand for repayment, the issue is not entirely free from doubt. *See Ubique Ltd. v. United States,* Ct.Cl. No. 377–77 (opinion of Trial Judge Schwartz filed January 30, 1980, at 16–17, adopted by order entered May 23, 1980). On balance, however, and in the narrow and peculiar circumstances of this case, it is concluded that remand to the Board would be an exercise in futility.

The parties are in agreement as to the amount of the unliquidated progress payments outstanding at the time of the default termination of the contract, that due demand for repayment of such amount was made by defendant, and that that demand has not been satisfied in the meantime. In light of the foregoing, defendant's counterclaim may properly be allowed (to the extent meritorious) in this proceeding, without any necessity for purely formalistic administrative findings respecting facts which have been and still are conceded. *Cf. Maxwell Dynamometer Co. v. United States, supra; see also Campeau Tool & Die Co. v. United States,* 650 F.2d 287 (Ct.Cl.1980).

 Contract 2410 incorporated by reference, in Clause L–1200, a general interest provision that reads, in pertinent part:

### INTEREST (May 1968)

Notwithstanding any other provision of this contract, unless paid within 30 days all amounts that become payable by the Contractor to the Government under this contract * * * shall bear interest at the rate of 6 percent per annum from the date due until paid * * *. Amounts shall be due upon * * * (ii) the date of the first written demand for payment, consistent with this contract, including demand consequent upon default termination; * * *. [32 C.F.R. § 163.118 (1980).]

This plainly grants defendant an entitlement under the contract to 6 percent interest on the unrepaid progress payments, dating from 30 days after plaintiff's receipt of defendant's default letter of August 17, 1973. We decline at this time to rule on two deferred payment agreements that defendant alleges grant it further interest. These agreements were executed after the events that gave rise to this dispute and are not properly part of this case in its present posture.

Accordingly, plaintiff's motion for summary judgment is denied and its petition is dismissed. Defendant's motion for summary judgment is granted, and judgment is entered in defendant's favor on its counterclaim in the amount of $18,879 plus 6 percent simple interest thereon from 30 days after plaintiff's receipt of defendant's letter of default.