TIMBERLAND PAVING AND
CONSTRUCTION CO.,
Plaintiff,

v.

The UNITED STATES, Defendant,

and

the American Insurance Co.,
Third Party.

No. 123–81C.

United States Claims Court.

Aug. 31, 1989.

William Bennett, Portland, Or., for plaintiff.

Katherine A. Day, with whom were Asst. Atty. Gen. John R. Bolton, David Cohen,

and Thomas Peterson, Washington, D.C., for defendant.

Charles Flower, Yakima, Wash., for third party.

## OPINION

BRUGGINK, Judge.

This action involves a road project awarded on September 29, 1978 to Timberland Paving & Construction Company, a Washington state corporation, by the United States acting through the Bureau of Indian Affairs (BIA). Timberland was default terminated on April 23, 1980. Plaintiff filed a complaint here pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982) (CDA) asserting breach of contract, and seeking an equitable adjustment for changes and differing site conditions. Defendant counterclaimed, seeking liquidated damages and reprocurement costs. At the conclusion of the first trial, conducted over a two week period in Yakima, Washington, the court (Woods, J.) determined that Gene R. Powers, purportedly acting on behalf of the Government, did not in fact have the authority as Contracting Officer (CO) to issue a termination for default. 8 Cl.Ct. 653 (1985). The matter was remanded to the CO "to determine the amount due plaintiff as if the April 23, 1980, notice of termination for default ... had been issued pursuant to the contract clause providing for termination of the contract for convenience of the government." *Id.* at 662. The matter has been the subject of two subsequent CO decisions and extensive efforts at settlement. The action is presently before the court after trial on June 27 and 28, 1989 on the merits of Timberland's current claim for termination for convenience costs.

## FACTUAL BACKGROUND [1]

The project at issue involved road work in the Signal Peak area of the Yakima Indian Reservation. It was given number YIR 140(4). The chief features of the original project design were: (a) excavating unclassified material bordering a ½ mile stretch of the road ("rock bluff" area) to be used as fill in at least five grade change locations; (b) changing the road's vertical grade in five locations; and (c) replacing the existing gravel surface with an asphalt surface. The primary purposes of the BIA's design for the rock bluff excavation were to move the toe of the slope back approximately sixteen feet to create a catchment into which materials raveling from the slope face could drop without endangering traffic on the road and to provide fill for realignment of parts of the vertical grade. The contract required that a rock bluff between road stations 297 and 323 be excavated with a one-quarter-to-one backslope.[2] The excavated material was to be used as fill elsewhere. The contract did not specify the method of excavation except as follows:

> Section 203.03 Unless otherwise provided in the contract, rock excavation which requires drilling and shooting shall be presplit ... The finished presplit slope shall be reasonably uniform and free of loose rock. Variance from the true plane of the excavated backslope shall not exceed 12 inches (305 mm); however, localized irregularities or surface variations that do not constitute a safety hazard or an impairment to drainage courses or facilities will be permitted....

In addition, the contract rock bluff drawing contains the following note: "Rock excavation which requires drilling and shooting shall be presplit." [3]

1. The parties have not objected to this court's resolution of those factual matters put at issue in the first trial but not previously resolved. The facts are thus drawn from the two trial records, the parties' stipulations, Timberland's answers, as amended, to defendant's requests for admissions, and from the decision of August 20, 1985. The court has read the entire transcript of the first trial and reviewed all the evidence admitted at that time.

2. The slope of a rock face typically is described as a ratio of horizontal to vertical distance. For example, a slope of ¼-to-1 measures 76 degrees from horizontal; a slope of ½-to-1 measures 63.4 degrees. An even shallower slope would be, for example, 1-to-1 or 1½-to-1.

3. Pre-splitting is a method of controlled blasting (light charges) by which a fracture plane is created in rock which prevents the resulting

The pre-existing road originally had been completed in 1964. The Contracting Officer's Representative, W. David Argo, testified that the rock bluff was not in fact all rock. The bluff was approximately half a mile long, of which about 1800 feet were rock, and 1000 feet were dirt. One of the effects of the redesign brought about by the project was to steepen the slope. It was not anticipated that the new slope would be sufficient to keep all loose rock from falling. It was expected, rather, that rock would fall into the catchment at the base of the slope. Argo described the rock as having horizontal and vertical fracture planes which lent themselves to relative stability on a one-quarter-to-one slope.

Timberland did a site investigation before submitting its bid. On September 29, 1978, defendant awarded plaintiff the contract for a fixed price of $1,282,842.00. Work was to be completed within 220 calendar days after receipt of the notice to proceed. Timberland received the notice on October 19, 1978 and the performance period began to run the following day under the contract terms. On November 1, 1978 Timberland subcontracted with North Central Construction, Inc. (North Central). The subcontract required North Central to load, haul and place fill material including the rock and earth excavated by the excavation subcontractor. On November 6, 1978 Timberland subcontracted with the Ellensberg Joint Venture to crush and stockpile basecourse and paving aggregate. On November 27, 1978 plaintiff obtained Morgan & Son Earth Moving, owned by Jay Morgan (Morgan) to do the unclassified excavation work (clearing, pioneering, drilling and blasting the rock bluff area). Third party American Insurance Co. furnished payment and performance bonds for plaintiff in connection with the contract.

With respect to the decision to order commencement of work in October 1978, Argo testified that fall is a good time to do

excavation work since the soil is normally dry. He also testified that there is usually no snow at the altitudes in question (2500—4000 feet) in October, although he would expect some snow at the higher elevations in November or December. He referred to October and November as the tail end of the season, and said that late November was "pretty chancy". The commencement of contract time was nevertheless appropriate, he felt, because it was possible to do rock work, although some amount of additional scaling[4] might be precipitated because of the over-wintering of the cut slope. Timberland did not at the time complain about the start-to-work notice. No work was performed at the job site in 1978. On December 8, 1978, Argo issued an oral work suspension order due to inclement weather. On December 21, 1978 the CO suspended operations at the close of business the previous day.[5]

Daniel Pokorny, project engineer for Timberland, defended the decision not to proceed in October. He testified that access to the work site is tenuous any time from the first or middle of November. The only risk described, however, was that two pieces of Morgan's equipment, a D8 Caterpillar tractor (CAT) and a drill, might be caught in snow. The difficulty with that was that the tractor might have to be "walked out," or that a "circuitous" lower route back to Yakima might have to be employed. He conceded that it would have been possible to get the excavation work on the rock bluff started, along with other smaller items of work.

On April 23, 1979, Timberland received notice from defendant to resume work and was informed that 170 days remained for performance under the contract. On April 23, 1979 Morgan mobilized men and equipment to begin work on the rock bluff road section. Morgan began by building a "pioneer" road on the slope—a primitive road or bench cut into the top half of the slope,

rock face from being adversely affected by subsequent blasting and excavation operations.

**4.** Scaling is a process of removing loose rock from a slope by hand or by mechanical means, such as a backhoe.

**5.** By Directive No. 2, Powers extended contract performance time by twelve days to correct the disparity between the oral and written shutdown orders.

both as a means of excavation and to enable drilling equipment to be brought in to operate off the bench. The roadbed was made partly by excavating with a bulldozer into the edge of the slope and partly by putting fill material lower down on the slope. Although Morgan initially anticipated the need for some blasting, the rock turned out to be more fractured than expected and Morgan was able to put in the road without blasting.

The pioneer road was located approximately halfway up the slope. Its height varied from 23 to 53 feet. It was approximately ten feet wide. Much of the material taken from the upper part of the slope was pushed below onto the inside lane of the existing road. The BIA required that at least one lane of the road be kept passable during construction. Some of the dumped material went 15 feet into the road and was to be removed by the hauling subcontractor.

Morgan used a D8 CAT for virtually all its excavation work. The tractor cab was open on the front, back and sides. In addition to using the CAT to excavate, Morgan scaled the slope above by using a backhoe to remove loosened rock. Morgan was instructed by Dan Pokorny of Timberland to scale. The same instruction was repeated twice by Argo who felt scaling had not been done sufficiently. Morgan did no hand scaling since he felt it was too dangerous. There were slides of rock and other material. On one occasion a slide ruined a hydraulic cylinder on one of the Morgan tractors. Morgan did not attempt presplitting by blasting, believing it would not have worked because of the condition of the rock. His view was that presplitting only makes sense when the rock is solid. He did believe that some production blasting (using larger charges) would have been necessary to complete the project.

Morgan or Timberland requested a waiver of the contract requirement that rock which was to be blasted had to be pre-split. On May 4, 1979, defendant permitted Morgan to do a production blast of a test section of the rock bluff without pre-splitting. After the rock had been cleared,

Argo concluded that the results were no better than those Morgan had gotten with the use of the dozer and backhoe alone. On May 21, Morgan was advised that any further blasting required pre-splitting. In Argo's opinion, the rock portions of the bluff were not too loose or fractured to preclude pre-splitting and blasting.

During this time no work was being done by North Central. Although Pamp Maiers, owner of North Central, or one of his employees were frequently at the site, Maiers testified that the area was never sufficiently prepared for North Central to begin hauling. The slope had not been presplit and the large rock that had been dislodged by the CAT and the production blast had not been drilled and shot (although some of the rock was apparently subsequently split). His contract with Timberland required all rock which had been "shot by others" be no larger than 4 cubic feet, but some was up to 100 cubic feet. Based on his conversations with Albert DeAtley, President of Timberland, Maiers assumed that virtually all of the work would be "shot" and that therefore all rock over 4 cubic feet would be reduced in size. He became increasingly frustrated with the slow pace of the excavation work and with the size of the material that Morgan was loosening. In Maiers' conversations with Pokorny, Pokorny acknowledged that the material was often too large to haul, and that they "had a problem."

Morgan and North Central reached a stalemate. North Central refused to begin its hauling because it was unable to get access to the material and because there were too many rocks too large to legally or practically haul. Morgan testified that this kept his company from doing more excavation in those areas where the roadway was already half blocked.

At a meeting at the site at the end of May between Maiers, DeAtley, and others, DeAtley agreed there was a problem with the way Morgan was proceeding and asked for Maiers' suggestions. This was DeAtley's first visit to the site since work commenced. Maiers stated that Morgan's excavation methods were leaving a ragged,

dangerous overhang, and advocated taking Morgan off the job. He offered to bid on doing both the hauling and excavation. He anticipated cleaning up Morgan's work by mechanical scaling. Before he responded to Maiers' last proposal of June 5, DeAtley shut down the job.

Morgan's last day on the job was June 11. It had excavated 19,686 cubic yards before stopping work. None of that material had been hauled. It remained on the slope or in the roadway. There is no contention that Morgan's work did not comply with the prime contract.

According to DeAtley, the first indication of a safety problem came from Pokorny who reported concern about rock falling off the slope. On June 6, DeAtley telephoned Argo alerting him to the possibility. A meeting was held June 11, 1979 among Morgan, DeAtley, Pokorny, Argo, Hutton and others concerning safety. DeAtley took the position that the slope was unsafe for work. He testified that Argo took the position at that time that it was not. DeAtley then told Morgan to quit work, and requested that representatives of appropriate government safety agencies be consulted. On June 13, Roy Shinn and Terry Masters of the federal Mine Safety and Health Administration (MSHA) arrived at the site and a meeting was held at which DeAtley and Morgan were present. The MSHA representatives explained that they did not have jurisdiction over the issue. A number of possible alternatives were discussed, however, which might make excavation work safer, including changing equipment, or leaving a bench in the slope.

On June 18, Argo met with DeAtley to tell him that Morgan's then-present method of operation—using a CAT operating parallel to the slope—was in violation of OSHA regulation 29 C.F.R. Part 1926 (1979), and that Timberland was falling behind schedule. He told DeAtley that safety was a

responsibility of the contractor, something which DeAtley testified he understood.[6]

At some point DeAtley contacted the Washington Industrial Safety and Health Administration ("WISHA"). On June 20, Robert Llewelyn, Industrial Safety Engineer with WISHA, wrote DeAtley to "confirm recommendations" made to him the previous day. In that letter, he suggested that scaling loose rock would not be adequate protection for workers on the bench, but recommended maintaining the bench. On June 27, Llewelyn wrote Argo confirming a June 19 conversation. He referred to portions of the Washington code which prescribe various safety enhancing techniques, including scaling, benching, barricading, rock bolting, or wire netting, but he recommended benching or netting, i.e., putting wire mesh on the slope.

On June 21, DeAtley wrote Argo effectively refusing to proceed with work on the slope as designed because of advice from WISHA that workers should not operate below the cut as designed. He also asked for a meeting to discuss the situation.

On July 10, Argo wrote Timberland ordering it to commence work and do so in compliance with OSHA safety regulations, 29 C.F.R. Part 1926. That regulation states in part, at section 1926.651, that slopes must meet engineering requirements by scaling, benching, barricading, rock bolting, or wire meshing. He expressed concern that work was seriously behind schedule and urged plaintiff to "take necessary steps to assure a timely completion of your contract work to avoid termination for default or the assessment of liquidated damages."

A meeting was held at Timberland's request on July 18, 1979. Present were Powers, Argo, attorneys for Timberland, and Ed Payne, Area Road Engineer for the Portland Office of the BIA. Subsequently, Timberland's attorney, William Bennett, wrote the CO on July 20, making reference

6. The contract provided that:
 a. The Contractor shall comply with all applicable occupational safety and health standards relating to construction prescribed in 29 C.F.R. Part 1926.

 b. If the Contractor fails or refuses to promptly comply with the requirements of this clause, the contracting officer, or his authorized representative, shall notify the contractor of any non-compliance and indicate to the contractor the action to be taken....

to at least two methods of safety assurance as having been passed along to plaintiff by WISHA, via the CO, namely, putting wire mesh on the slope, or benching. Bennett refers also to the receipt by the CO on June 29 of a recommendation from WISHA. Apparently this was a reference to the June 27 letter from Llewelyn to Argo in which the following appears: "It appears that benching or netting would be the most practical method due to the nature of the rock," although reference is also made to scaling, barricading, or rock bolting. DeAtley testified that during this period of time, at least three alternatives were being "actively pushed" by the safety organizations: benching, putting mesh screen on the slope, and use of larger equipment to get the workers away from the slope. On July 20, Timberland responded, through counsel, to Argo's July 10 letter. Bennett stated that Timberland could not proceed with the excavation work without further instructions. Timberland questioned its ability to proceed with screening the entire slope or benching the slope in the absence of design changes from defendant.

Payne testified that it was his view that hand scaling could have been used to create a safe slope, and that this alternative was mentioned throughout the meetings held during this time.

On July 25, Phillip Queen, an official with OSHA, wrote DeAtley explaining that authority to supervise safety with respect to Timberland's work lay with either OSHA or WISHA compliance officers, depending on "jurisdictional considerations." No specific suggestions were made at that time. Subsequently there was a suggestion made about using a wire mesh to cover the slope.

On July 26, 1979 a meeting was held at the WISHA office in Yakima at which representatives of Timberland and the BIA were present. During the meeting, WISHA representatives stated that it was not their role to dictate engineering changes. They expressed reluctance to dictate specific safety methods, but suggested certain possibilities, such as netting, benches, or longer equipment, which they would evaluate after a plan was proposed. At that

meeting Argo told DeAtley that safety of Timberland's workers was Timberland's responsibility, and that the BIA expected work to proceed. DeAtley responded that it was his position that the design of the slope at a gradient of one-quarter-to-one was inherently unsafe.

Argo wrote the CO after the meeting, expressing frustration with progress on the contract and stating that it was "possible, but unlikely" that Timberland could complete on time. He also defended the design of the project as safe and conventional if scaling was employed, perhaps supplemented by other techniques such as wire netting or use of larger equipment. On that same date, the CO wrote WISHA and requested either advice on whether there was indeed a safety problem or resolution of which agency had responsibility to resolve the question.

There is little doubt that DeAtley had access to the safety organizations' suggestions either directly through his free contacts with their representatives, or indirectly through government representatives. As early as June 13, 1979 MSHA representatives had suggested to Timberland the use of wire mesh, or larger equipment, as well as a catch bench. There is no evidence, however, that the suggestion of putting wire screen around the tractor cab was ever put directly to Timberland by the safety agencies or the BIA. That suggestion was apparently first made by OSHA officials to Argo in November, 1980. Pokorny testified that Shinn and Masters discussed with him putting wire screening on the slope, "along with other suggestions." A similar suggestion was made to DeAtley when he contacted the State of Washington Department of Transportation in July or August, 1979.

On August 1, 1979, the CO wrote Timberland advising it that the BIA considered a design change neither necessary nor desirable and iterating that the determination and cost of appropriate safety measures were up to Timberland. Another meeting was held on August 26, at which Timberland proposed use of a ten foot wide bench cut into the slope. A further meeting was

held at DeAtley's suggestion on August 27, with representatives of the parties present. Shortly afterwards, Payne was told by WISHA officials that they had no jurisdiction over work on the Yakima Indian Reservation.

Work on the rock bluff area came to a halt about the middle of June 1979. During July and August 1979, neither plaintiff nor its subcontractors performed any work on the unclassified excavation item of the project. During this period other contract work was being performed, however. Ellensburg stripped and blasted pits and crushed rock aggregate from July 9 to October 10. Another subcontractor, Scafco, delivered culverts to the job site on August 20. Timberland did clearing on the project from September 5 to October 1.

On September 6, 1979 Timberland hired a new subcontractor, Yakima Indian Nation Heavy Construction Enterprise (Yakima) to replace North Central in doing the loading, hauling and placing of rock excavated by Morgan. Between September 20 and November 23, 1979, Yakima hauled the excavated material, placed some excavated fill material and installed culverts. It hauled 14,950 cubic yards of unclassified material before Timberland was terminated.

On September 21, Argo wrote a lengthy memorandum to the CO strongly urging that Timberland be default terminated. He reviewed the progress of work and concluded that "it is virtually impossible for the contractor to complete the work before contract work expires." On October 2, W.D. Babby, Assistant Area Director for the BIA wrote the Regional Solicitor recommending that Timberland be defaulted on the entire contract except for hauling and other work then being done by Yakima. On October 3, Payne initiated a "Legal Sufficiency Review," seeking evaluation of a proposed termination for default. A draft of a letter to show cause why the contract should not be default terminated was circulated on October 26. The time for performance under the contract expired at the close of work on October 9, 1979. Plaintiff exceeded the completion date for performance and was notified on October 10, 1979 by the Government that liquidated damages would be assessed for failure to complete within the 232–day period. Defendant also withheld from plaintiff's progress payments the cost of road maintenance ($5,295) which defendant alleges it was forced to perform.[7]

Although the possibility of default had been raised as early as July, and it was urged thereafter by Argo, Payne initially recommended against it on the ground that it would be better to try to get Timberland to finish the project. By October 2, however, it was obvious that default termination was being strongly considered, although Payne's notes reflect that caution was advised to prevent legal missteps, and in order to have Yakima finish clearing the road to open two lanes of traffic. The notes reflect a determination by Payne and Argo that termination for default proceedings should commence upon expiration of the contract work period, calculated to end October 9. Authority to do so lay, however, only with the CO. Payne and Powers testified that the first decision by Powers to terminate for default occurred the week before the notice was sent out—April 23, 1980. They explained that the reason the contract was not terminated before April was that BIA was giving consideration to Timberland's request for a time extension and to its proposal to change the design of the project. The proposal had been prepared at Timberland's request by Andreotti & Associates, Inc. and furnished by plaintiff to the BIA on November 21.

The Andreotti proposal offered three alternatives to the BIA design. One was to use wire mesh on the face of the slope. A second was to dramatically flatten the gradient of the slope. Since Andreotti found too many disadvantages to these alternatives, it recommended a third, which involved shifting the roadbed away from the slope by adding fill beyond the outside

---

7. On July 10 and July 18 Argo wrote Pokorny complaining about the quality of road maintenance. That road maintenance was never performed by Timberland. It was subsequently done by defendant and the cost offset against Timberland's earnings.

lane, and then cutting a bench into the slope. The canyon adjacent to the road is at a slope of approximately one-and-a-quarter-to-one and is about two hundred feet deep. Argo evaluated the proposal and wrote the CO on December 5, 1979 giving an analysis which, in substance, says that while some of the factual predicates to Andreotti's proposal are incorrect, he would assume the work could be performed, although the recommended move of the road would be very difficult without expensive efforts to keep the fill slope in the canyon stable. His ultimate conclusion was that the work was too costly, and that in any event there was no need to change the design; Timberland was responsible for providing a solution within the existing design. There was no response to the proposal until the letter of February 25, 1980, in which it was rejected.

Plaintiff requested that the project be shut down for the winter on October 24, 1979. However, shutdown was denied until November 23, 1979. At the same time Timberland was advised by Powers that it had exceeded total contract time by 45 days. Throughout the summer and fall of 1979, Timberland was repeatedly asked for a revised contract completion schedule, but one was never supplied. No contract work was accomplished between November 23, 1979 and April 23, 1980.

On November 21, 1979 Payne had a telephone conversation with an official of OSHA in which three alternative safety suggestions were passed along. OSHA suggested use of wire screen around the cage, heavier equipment, or covering the slope with wire mesh. That information was not conveyed to Timberland.

On November 27, 1979 Powers directed Timberland to show cause why the contract should not be terminated for default. On December 13, 1979, plaintiff responded by arguing that any action to terminate the contract at that time would be inappropriate. Plaintiff simultaneously submitted two claims to the CO seeking contract payments allegedly improperly withheld to cover defendant's road maintenance and as an assessment of liquidated damages. In conjunction with the latter claim, plaintiff asserted that it was not in default because it was entitled to an extension of contract time. Plaintiff gave notice that it wished to have both claims determined under the CDA.

In early April 1980, Pokorny went to the site to see if work could begin. He was told by Argo, who was there at the time, that conditions were still too wet. Pokorny's plan for completing the work was ill-defined. He testified that he planned on returning to haul the loose rock, "pave the job and, hopefully, by the time we got through with the paving, we would have some sort of a solution for the small amount of material that would be left in the toe of the bluff area that we would somehow figure out how to get loaded and hauled away, or whatever was necessary." He further testified that there was a substantial amount of material excavated by Morgan that still lay in the pioneer road. "It could have been hauled away without encountering the rock bluff in the drilling situation." "[W]e did not have a plan or an approach to take, whether we were going to screen it or whatever we were going to do. We did not have a way to solve the safety problem at that time." Although Pokorny had not heard of using wire screening around the CAT cage until litigation, he had been aware at the time of the four other safety suggestions made by the safety agencies (benches, wire mesh over slope, making the slope much shallower, or larger equipment). The possibility of using a wire screen around the CAT cage did not occur to him, but he acknowledged that it did not because it was "too simple of a solution." He was familiar in general with the use of screening around tractor cabs in the logging industry. Pokorny testified also that Morgan told him he (Morgan) could complete the work, including North Central's part of it, but that DeAtley was "cool" to the idea. Pokorny stated that despite the order to show cause, he was expecting to return to the site in the spring, despite the lack of a plan to finish the work or any "prospects of solving the problem."

Apparently DeAtley was equally uncertain about what Timberland would do to complete the project. He had not come up with a solution by spring 1980: "[W]e figured there would be some solution to it, somebody would come up with some way to do it or we would come up with some way to do it."

On April 23, 1980, the Government issued a "Notice of Termination for Default" informing plaintiff that the contract was being terminated due to plaintiff's failure to complete the work within the specified time period. At no point during contract performance did Timberland submit a claim of a differing site condition.

Defendant tendered contract completion to the bonding company, the third party, which then employed an engineering consulting firm, CH2M Hill, to prepare a study of the remaining work. George Fisher, a senior engineering consultant with CH2M Hill testified that he explored the site on June 19, 1980. He was of the opinion that the slope could be scaled using a backhoe to force loosened rock down, and that it might be possible then to drape wire mesh over the remaining rock to minimize danger to workers below. He testified that once the hoe had scraped the slope, he would not have "any particular safety concern about the personnel operating a loader or a shovel."

In July 1980 William Hammett, an employee of Superior Asphalt and Paving Company, one of DeAtley's companies, went at DeAtley's instructions to the site, along with Brian Mulrun, of the J.J. Welcome Company. Hammett testified that in terms of expertise in the area of rock excavation, drilling and blasting, on a scale of one to ten, with Mulrun as a ten, DeAtley and Timberland would rate only a one and a half. Mulrun, in other words, was the expert. Hammett was instructed by DeAtley to investigate the possibility of submitting a bid for the reprocurement on behalf of the bonding company, but through a related DeAtley company, Mid–Columbia Paving Company. Hammett testified that Mulrun proposed using some drilling and blasting and doing the actual excavation by

having front end loaders or hoes place rock and dirt into the top of scrapers. Pokorny was present during that visit. No mention was made of a safety problem, and Hammett assumed that the use of machinery with a longer reach than a tractor was the reason safety was not a concern to Mulrun. DeAtley expressed no concern about safety when he instructed Hammett to investigate the possibility of bidding on the reprocurement. Mid–Columbia ultimately got a bid from J.J. Welcome Company to do the excavation subcontracting work in the event Mid–Columbia got the reprocurement. When the bid was being prepared, DeAtley did not express any concern with safety to Hammett.

The bonding company turned down the Government's tender to complete the work on August 29, 1980, and defendant issued an invitation for bids on the reprocurement, Project YIR 104(R), on September 29, 1980. Bid opening was held on November 5, and all bids were rejected. A second reprocurement on Project YIR 140(4)R–1 was conducted and on May 22, 1981, Sime Construction Co. was awarded the contract. Both Timberland and North Central were unsuccessful bidders on the second reprocurement contract.

Sime successfully completed the project to the satisfaction of the Government. Unlike the original contract and the first reprocurement, the second reprocurement did not call for paving the road. The slope design on all three procurements was the same, however. There were no additional safety specifications, other than the removal of trees above the cut, although Argo passed on to Sime the OSHA suggestion about screening the CAT. While there was testimony that the "as built" gradient of the slope was shallower than one-quarter-to-one, there was inconsistency in that testimony, even among plaintiff's witnesses. For example, Frank Pita, an engineer with CH2M Hill, testified on direct that the slope was about one-half-to-one in the summer of 1982, but on cross examination testified concerning the same period of time that his impression was that the slope was "on the average about a quarter-to-one," and actually steeper in places. The court

finds, particularly in view of Pita's and other witnesses explanation of the process of sloughing caused by thawing and freezing in those altitudes, that if there was deviation from a one-quarter-to-one slope, most of that deviation would be attributable, not to change in design, but either to over-excavation by Morgan, or to the natural process of freezing, thawing and sloughing.

## PROCEDURAL BACKGROUND

Pursuant to Judge Wood's decision, the termination for default was converted to a termination for convenience. This had the effect of eliminating any claim defendant might have for reprocurement costs, and for liquidated damages beyond the termination date (April 23, 1980). What remains are Timberland's claims for termination for convenience costs. It is important in that connection to establish the chronology of claims:

1. Claims 1 and 2 were received on December 14, 1979. They were for contract payments allegedly improperly withheld due to Government road maintenance ($5,295), and for recovering payments withheld to offset liquidated damages up to that point ($10,450). These claims were not certified.

2. Notice of termination for default was issued on April 23, 1980. As part of the notice, plaintiff's claims of December 14 were denied.

3. Claim 3 was originally transmitted on July 23, 1982, and modified slightly on October 18, 1982. It was an undifferentiated, unexplained claim for termination for convenience costs in the amount of $250,000. It was certified.

4. After Judge Woods' August 29, 1985 ruling, a Termination Cost Settlement Proposal was submitted on behalf of Timberland on January 10, 1986. A total of nine items of cost were set out. The total amount sought was $331,500.96. The proposal was not certified.

5. A revised Termination Cost Settlement Proposal was transmitted on June 24, 1986. It sought cost recovery for the same

nine items, in a total amount of $265,-153.10. It was not certified.

6. On March 19, 1987, the CO issued a decision on the revised proposal, allowing a total of $74,962.10 after government offsets.

7. On May 19, 1988, Timberland submitted its Final Claim and Demand for Payment, in effect a second revised termination cost settlement proposal. The same nine items of recovery were sought, in the total amount of $320,297.91. The proposal was certified.

8. On August 12, 1988 the CO issued a decision on the May 19 proposal, allowing costs of $32,363.54, net of offsets.

9. During trial on June 27–28, defendant modified the August 12 decision and allowed a net total of $95,208.93.

## DISCUSSION

The 1978 contract contains a provision outlining the parties' respective rights in the event of a termination for convenience, SF–23–A. Paragraph (e) provides in relevant part:

(1) With respect to all contract work performed prior to the effective date of the notice of termination, [the contractor is entitled to] the total of—

(i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto ...,

(ii) The cost of settling and paying claims arising out of the termination of work under subcontracts or orders....

Paragraph (h) states that:

In arriving at the amount due the Contractor under this clause there shall be deducted (1) all unliquidated advance or other payments on account theretofore made to the Contractor, applicable to the terminated portion of this contract, (2) any claim which the Government may have against the contractor in connection with this contract....

Plaintiff's nine items of claimed settlement cost will be discussed in the order presented in its final claim for settlement costs.

### 1. Contract earnings—the liquidated damages issue

The issue of liquidated damages is raised initially in defendant's treatment of Timberland's claim for $36,152.34 in contract earnings. Those stipulated earnings were withheld from pay estimate number 8, dated November 23, 1979, because of the application of 45 days of liquidated damages at the contract rate of $475 per day. (277 calendar days less 232 contract days.) The CO based this determination on the fact that the contract work period had expired on October 9, 1979. He rejected Timberland's contention that it was entitled to a 136 day extension of time, calculated as follows: the notice to proceed should not have been issued in 1978 (50 days); the period between June 6, and September 5, 1979 was not effective work time because of confusion as to which agency had jurisdiction as to the safety issue (56 days); and the contract should have been shut down earlier in 1979 (30 days).

■ Defendant correctly points out that liquidated damages can be allowable in the event of a termination for convenience. *See Martin J. Simko Constr. Co. v. United States,* 11 Cl.Ct. 257, 272 (1986), *vacated and remanded on other grounds,* 852 F.2d 540 (Fed.Cir.1988). This court's opinion of October 22, 1987, moreover, held that Judge Woods' decision to convert the termination for default to one for convenience did not have the effect of barring defendant's attempted offset for liquidated damages. Rather, the effect of the 1987 opinion was that the assessment of liquidated damages had to cease, at a minimum, on April 23, 1980, the day of termination. The issue, therefore, of whether Timberland is entitled to all its contract earnings without an offset for liquidated damages turns on whether its arguments about the running of contract work time are successful. They are not.

#### a. The 1978 notice to proceed

■ Timberland seeks a fifty-day contract extension with respect to the CO's decision to treat the period between October 20, 1978 the notice of proceed and December 8, 1978 (the work suspension order) as time available for work. The contract provides that the 220 day performance period commences upon receipt of the notice to proceed. The CO amended this to add twelve days. It is undisputed that if the total contract period of 232 days remains the benchmark, Timberland was 45 days overdue on April 23, 1980.

■ A contractor may be entitled to a remission of liquidated damages when delay was caused by unusually severe weather. *Broome Constr. Co. v. United States,* 203 Ct.Cl. 521, 531, 492 F.2d 829, 835 (1974). It is also well established that the Government is not entitled to withhold costs for delay in completion that results from unforeseen conditions. *General Casualty Company v. United States,* 130 Ct.Cl. 520, 537, 127 F.Supp. 805, 815, *cert. denied,* 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266 (1955). In this case, however, plaintiff produced virtually no evidence to support its contention that issuing the notice to proceed in October was unreasonable. Pokorny's explanation that if a tractor or drill were brought in they might have to be "walked out" or taken a longer route back to a lower altitude suggests a potential inconvenience but does not explain why that would be impossible or even difficult or impractical. Timberland did not demonstrate that the weather during that 50 day period was severe or would have prevented successful excavation. It did not complain of the notice to proceed at the time. Argo, on the other hand, testified that although there would have been no point in a general mobilization, that it would have been practical to at least commence the excavation work since it required limited equipment and since there are advantages to doing rock and excavation work in fall because it is a dry season. That testimony was not directly rebutted. The court is persuaded that the Government's decision was reasonable, and that in any event, Timberland's failure to proceed was due to its lack of preparedness or its estimate that time remaining was sufficient to complete the

work the following season.[8] The court holds that the Government acted properly in issuing the notice to proceed in October.

### b. The 1979 work stoppage

■ Timberland claims that it is also entitled to a 91 day extension of time to cover the period from June 6 through September 5, the day that resolution of the jurisdictional question was conveyed to Timberland. The court rejects this argument. The reason plaintiff suspended excavation work had nothing to do with safety, much less with a legal question about agency authority.

That conclusion is not inconsistent with certain stipulations of the parties. The parties have stipulated that "it was not possible for plaintiff to proceed with work in the 'rock bluff' cut area until a safe method of work which did not violate OSHA and WISHA regulations had been determined." They further stipulate that the issue of which agency had jurisdiction was unresolved throughout the summer of 1979, and that "WISHA advised Plaintiff and Defendant by 9/05/79 letter, WISHA did not have jurisdiction of the [project]." These stipulations leave room, however, for what the court finds to have occurred, namely that safe methods of work were made known to Timberland which did not violate any agency's safety regulations. The CO received a letter dated August 3, 1979 from James Lake, the Regional Administrator for OSHA, stating that although the matter was not finally resolved, legal staff was of the view that OSHA rather than WISHA had authority, and that in any event state and federal standards did not conflict. It is also clear from the record that there was no meaningful difference between OSHA's substantive recommendations and WISHA's. As will be discussed below, there were ample suggestions from the beginning, and at no point was Timberland forced into conflicting choices. DeAtley testified further that he was unaware of any differences between

the safety requirements of the two agencies.

Two other circumstances strongly suggest that the issue of which agency had jurisdiction is a chimera. First, there is the absence of any movement by Timberland to commence work on September 6. If it genuinely was simply waiting to hear if OSHA had authority to recommend safety measures, it would have proceeded with some of OSHA's suggestions, which are discussed below. The second reason it is obvious that this assertion is a present convenience is that the real reason the status quo shifted from work to lassitude in June was Timberland's lack of interest in, or inability to solve the dispute between the two subcontractors, Morgan and North Central. Morgan never complained about safety problems and testified that safety had no bearing on why he left the site. He testified rather that any safety problems "we took care of." Morgan did not consider the work any more dangerous, at least up to the point at which he quit, than any normal rock job. He also explained that the large rock evident on photographic exhibits were not those that were sliding down from the top of the hill. Rather, they were the rocks "holding up" the hillside that had been removed by the pioneering. The rock that tended to slide was the smaller, less dangerous rock.

The reason Morgan left was the failure of North Central to remove the build up of loosened rock. This was confirmed by Pokorny, who conceded that North Central's failure to remove material was one of the two reasons Morgan walked off. Morgan twice offered to Timberland to haul away the material and complete the job. Morgan testified he would have completed the work if someone had hauled the material away. If he had had to proceed with drilling and presplitting, he would have been willing to do so with no more safety equipment than his hardhat. He was told, however, that DeAtley did not want to take up his offer.

---

8. The court notes DeAtley's testimony that he did not take seriously reminders about comple-

tion dates, or threats of termination.

Timberland correctly points out that one of the alternatives suggested by MSHA, WISHA, and perhaps OSHA as well was the change of the design to make the bench permanent. That was not the only suggestion, however. Defendant was not obligated to redesign the project if the original plans could be practically completed. With respect to the design of the slope, specifically the use of a one-quarter-to-one gradient and the rejection of the Timberland/Andreotti proposal to use a bench or to flatten the slope, the court is persuaded that the original design was a proper one and was not the cause of Timberland's difficulties. Even DeAtley conceded that the original design "could have safely been completed by some method." CH2M Hill engineer Pita felt that the rock at the site was more fractured and unstable than the designers probably anticipated, but conceded that the philosophy behind it—to minimize horizontal acceleration of falling rock by steepening the slope and providing a catchment area away from the road—made sense. This was confirmed also by defendant's expert witness, Dr. Douglas Piteau, who testified that the one-quarter-to-one slope was consistent with standard industry practice. "[T]he steeper slope improves the projectile path: rocks that do fall will tend to hit the ditch or catchment below with a near vertical trajectory. They are less likely to skip off the slope or roll into the roadway, as can sometimes happen with a flatter slope." Even with a gradient of one-half-to-one, rock still would periodically fall off the slope. He also explained that sufficient presplitting and blasting could be done to minimize any safety risk from overhanging rock.

While Pita took issue with Piteau's conclusions, he conceded that portions of the excavation could be presplit and blasted. Piteau also discounted Timberland's proposed intermediate bench. If a bench had been placed without moving the roadbed, it would either have been too narrow to effectively catch falling rock, or would have been too close to the traveled part of the road and defeat the purpose of the redesign. Andreotti's suggestion that the roadbed could be moved onto new fill did

not, in his view, "merit serious engineering consideration." He was supported somewhat in the latter view by Pita, Timberland's witness, who questioned the engineering soundness of the proposed fill slope gradient of one-half-to-one. Piteau concluded that the problems of construction at issue "were not particularly challenging" and that there was no reason a competent contractor could not have built the slope to the project design "with conventional and safe construction practices." Without discounting Pita's qualifications in any way, the court gives greater weight to the testimony of Piteau, who Pita acknowledged to be one of the leading experts in rock slope engineering, based on Piteau's more extensive training and experience specifically in the area of rock slope engineering.

Robert Washburn, highway engineer with the state, and someone with significant experience in precisely the type of road construction at issue, concluded that the Andreotti proposal to move the roadbed was "totally unsound," and "totally unfeasible." Washburn also visited the site and afterwards wrote Argo on August 20, 1979 that the one-quarter-to-one slope was a safe design in terms of roadway users.

Further support for defendant's position came from Ronald Chassie, Regional Geotechnical Engineer for the Federal Highway Administration for the region including Washington state. He emphasized, as did Piteau, that an important economic consideration in rock cut design is the minimization of unnecessary excavation through use of steep banks; that it is common and sound engineering practice to design for *overall* stability, and to accommodate any rockfall; that elimination of all rockfall would be cost prohibitive. He also testified that the one-quarter-to-one gradient for the slope was a proper one considering the rock conditions and height of the cut.

The facts that safety was not even an issue in July 1980 when takeover was being considered, and that Timberland later bid on the reprocurement also strongly suggest that there was no need to redesign the

slope. As does the fact that Sime successfully completed the work using the same construction techniques as Morgan. Argo did not recall any complaints from Sime about the slope gradient or threats from safety agencies concerning the way Sime was doing its excavation work. The ten foot catchment area seemed to be working to trap rock falling off the slope.

The court is persuaded that Timberland could have avoided a shutdown either by better supervising Morgan, or by taking up North Central's offer to finish the work using mechanical scaling. In any event, Timberland was told by the various safety agency representatives, or by defendant's representatives, or should have known itself, of at least four methods of proceeding which would have been safe, and which would not have required a redesign: the use of wire mesh on part or all of the slope; the use of some pre-splitting and extensive hand or machine scaling; the use of larger equipment; and the use of wire screen around the cab of the CAT.

The utility of these methods was amply supported on the record. For example Pita, Timberland's witness, testified that hand scaling is a method used in rock cut work adjacent to roads. DeAtley must have comprehended what was meant by the suggestion to use larger equipment, since he described it in testimony as "Manitowocs or very large front end loaders." He discounted this suggestion because the equipment would have to operate in what was then the one remaining open lane. That difficulty, however, was entirely Timberland's fault, and in any event, curable.

The testimony is persuasive that the character of the rock would not have precluded making use of predrilling and blasting, and that Timberland would have had less problem with loose rock and oversized rock if Morgan had made more use of that technique. While the contract does not specify the means of excavation, Argo did not anticipate Timberland would use primarily a tractor to rip and bulldoze the slope because such a method results in large amounts of oversized material. Argo testified that visual inspection was enough to make a bidder aware of the problems with ripping and dozing. He expected use of predrilling. This is consistent with the testimony of Pamp Maiers, of North Central, who also bid on the 1978 contract. He had anticipated doing some predrilling and blasting when preparing North Central's bid on the 1978 contract. He testified that although much of the bluff section could be excavated by tractor, it would have been necessary at the higher numbered stations to do drilling and blasting in order to maintain slope control. In addition, hand scaling was a safety measure available to Timberland, even though Morgan used ripping and dozing.

Timberland argues that the Government failed to disclose superior knowledge about the alternative safety measure of screening the cab—one of the means ultimately employed by Sime in finishing the work.[9] There was testimony from witnesses for both parties, however, that screening the cab was a method was known in the industry, or which should have suggested itself to Timberland. See *Intercontinental Mfg. Co. v. United States*, 4 Cl.Ct. 591, 600 (1984). The wire mesh idea earlier had been suggested to Timberland by OSHA, and Payne testified that permanent wire mesh, larger equipment, and scaling were techniques, he thought, in customary and

9. The only evidence of safety measures taken by Sime not taken by Morgan related to use of screening around the CAT. From the outset of the reprocurement contract, Sime was ordered to put wire around the cab of the tractor. Argo testified that he gave Sime a copy of the OSHA memorandum which mentioned screening. This difference in treatment is not a basis for concluding, as Timberland does, that the Government had superior knowledge which it improperly withheld. The potential for use of wire screen around the CAT as a safety device is not information which precipitated a duty in defendant to disclose superior knowledge. In view of other methodologies made known to Timberland, information about screening the CAT was not "vital". Also there was no proof the Government knew Timberland was not aware of the use of screening, and in any event, the use of screening was known elsewhere in the industry. See *Petrochem Services, Inc. v. United States*, 837 F.2d 1076, 1079 (Fed.Cir. 1988).

usual use in 1979, although he was not aware of any use of temporary wire mesh.

The court finds that the conduct of government officials in encouraging contact with safety agencies, while at the same time asserting plaintiff's obligation to find a solution to the rock fall danger met contract requirements. The court specifically finds that Timberland's inaction in the face of any lingering uncertainty about the jurisdictions of the three safety agencies was totally inappropriate. Argo's instruction to proceed in compliance with 29 C.F.R. Part 1926 was comprehensible because most of the methodologies listed there had been mentioned by the safety agencies. Nor was there was ever any inconsistency in the advice of the agencies. Timberland's reluctance to act might have been partially excused if there was ever any serious dispute about the counsel offered, but there was not.[10]

There are a number of other indications that DeAtley's concern with safety was not genuine. The court notes particularly that Timberland's contention that it was actively pursuing a safe way to perform the contract are completely disingenuous. They are belied by a number of facts. First, DeAtley testified that this safety conundrum was one unlike any he had ever seen, and despite much alleged thought devoted over the winter of 1979–80, he and Pokorny had absolutely no idea of how to proceed in April. What is remarkable, then, given the asserted seriousness of the problem, is that these men were inexplicably confident some solution would develop; they had no worries whether the work could be done.

Second, this alleged concern is inconsistent with DeAtley's conduct during the reprocurement. He testified that he elected to have another of his companies, Mid–Columbia, submit a bid to do the same work. When asked by his counsel whether he considered the safety problem solved in the interim, he said it had been, because Mid–Columbia had plans to contract with a competent excavator, J.J. Welcome Co. In that light, the following dialogue is illuminating:

Q Well, you still hadn't resolved the safety problem, though, had you?

A On the reprocurement?

Q Yes.

A We had what we considered resolved the safety problem on the reprocurement.

Q What was that?

A J.J. Welcome Company said they could build that cut to plans and specifications within the safety rules and regulations.

Q Do you know the details of how they planned to do that?

A I do not; I did not talk to them, myself. Mr. Hammett was the one that was putting the job together. I don't know.

Third, DeAtley's testified that the reason he stopped work in 1979 was his concern for safety:

A ... [A]nybody driving down the road in the industry would, I would think, would see the problem, and see—and see the safety—the severity of it.

Q Well, why was it a problem?

A Well, because the rocks were rattling off this cliff and they were coming down and hitting the cab and hitting the people working below it. I mean, it was a—it was an unsecure rock cut that—the rocks weren't staying up there; they were sloughing off.

This testimony is simply not believable. Initially because Pokorny, his project engineer, who, unlike DeAtley, had actually been at the site, presumably was "in the industry" and yet had permitted work to proceed for two months. Next because there is not any other evidence or testimony that rocks were "hitting the workers."

DeAtley's exaggeration of the safety danger is also apparent from Timberland's handling of the hauling work. DeAtley

10. MSHA made clear by June 13 that it had no jurisdiction. By July 10, Argo instructed Timberland to implement 29 CFR Part 1926. DeAtley testified that use of larger equipment and wire mesh were ideas being "pushed" by the agencies in June and July. By August 27, WISHA had taken itself out of the picture.

initially testified that the reason Timberland did not itself remove the rock that North Central was supposed to haul was because "I considered it a safety problem to do that. And I therefore shut the job down. We couldn't proceed." When instructed to keep open two lanes of traffic, however, Timberland promptly hired Yakima to haul the loose rock, *i.e.*, the same work which had been too unsafe earlier. DeAtley was offered the opportunity by his counsel to explain the apparent contradiction:

Q To what extent, if any, did you consider the Indians' work to be a safety problem?

A [T]here was no safety problem because they were out away from the cut.... They were moving about ten feet of the outside part of the bench. They were away from where those rocks could fall on them.

Nothing had happened in the interim. It is obvious that DeAtley's first statement was merely intended to create an impression of a safety problem.

The court's lack of confidence in DeAtley's testimony is also a result of his different responses to a single inquiry, why did North Central never begin to work? His first response was that "[Maiers] indicated to me that there were some scheduling problems with other work [and] the size of the rocks that were there...." Later he responded differently: "Well, about the time that Maiers should have come to work, is when the safety problem came out. Now, I don't know—I don't know whether the chicken or the egg came first in that particular situation. I don't know whether he refused to come prior to the safety problem or right after it. I don't know." There is a clear inconsistency between the two responses. The first one is consistent with Morgan and Maiers' testimony; the latter is once again consistent with an effort to create an impression of a safety problem.

In the final analysis, the court can understand Dr. Piteau's observation upon visiting the site for the first time, that he was surprised "a rock slope problem of such limited size and complexity could generate such a substantial controversy between the parties." There was a legitimate concern for worker safety in June 1979, but no more than would have been required by any similar project elsewhere. The court finds that Timberland's difficulties were of its own making. The means of proceeding safely were available to Timberland; it simply chose not to do so. Once work ceased, Timberland inflated the problems associated with safely returning to work and shifted its efforts, not to a resolution within contract requirements, but to one that required a design change, and one that had no real necessity or merit.

■ To establish that the project could not be built as designed, Timberland would have to demonstrate that performance was either impossible or impracticable. *See Piasecki Aircraft Corp. v. United States*, 229 Ct.Cl. 208, 226–27, 667 F.2d 50, 62 (1981); *Jennie–O Foods v. United States*, 217 Ct.Cl. 314, 328, 580 F.2d 400, 409 (1978). The plaintiff has failed to carry its burden of proof. In sum, the court finds that the original design could have been safely executed. The court concludes that Timberland is not entitled to any extension of time for the period June through November 1979.

c. Delay in declaring default

■ Timberland argues that the defendant waived its right to assess liquidated damages by excessively delaying the decision to terminate plaintiff for default. Plaintiff argues that defendant's personnel had made a determination to terminate Timberland as early as October, 1979, and that the contract work days which expired between the end of the contract period (October 9) and the winter shut down (November 23) cannot be used as a basis for the assessment of 45 days of liquidated damages.

In *DeVito v. United States*, 188 Ct.Cl. 979, 990–91, 413 F.2d 1147, 1153–54 (1969), the court held:

Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders

its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time expired for a termination notice to be given.... The necessary elements of an election by the nondefaulting party to waive default and delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent.

.... The period for termination after default will naturally be greater where the contractor abandons performance or where his situation is such as to render performance impossible or unlikely, than where he continues performance in reliance on the lack of termination and proceeds to incur obligations in efforts to perform....

While the *DeVito* rule is applicable outside the supply contract context, *see Olson Plumbing & Heating Co. v. United States,* 221 Ct.Cl. 197, 602 F.2d 950 (1979); *Overhead Elec. Co.,* ASBCA No. 25656, 85–2 BCA Sec. 18,026, the rule "has only been applied when exceptional or rare circumstances are presented in a construction contract case." *Indemnity Ins. Co. of North America v. United States,* 14 Cl.Ct. 219, 224 (1988). Circumstances here do not suggest unreasonable delay on the part of BIA in terminating the contract. While Argo, and later, Payne, were advocating termination in 1979, the court accepts the testimony of defendant's witnesses that the determination to default terminate was not actually made until the week before April 23. This is credible and reasonable in view of Payne's preference, at least in September and the first half of October, to try to get Timberland to finish the work, and his later concern about a precipitate shutdown without legal evaluation, and while Yakima was doing important hauling work.

#### d. Calculation of unpaid earnings

■ The parties agree that the net amount that would have been due Timberland as unpaid contract earnings is $30,857.34. The court allows liquidated damages at the contract rate [11] of $475 per day for 45 days in the total amount of 21,375. In the CO decision of October 5, 1988 defendant also withheld $10,902.81 to cover the cost of 4,803 tons of base course replacement. Defendant established that because Morgan piled excavated rock on the roadway, that the top course of gravel became contaminated and later had to be replaced when the loose excavation was removed. Sime eventually put gravel down and Timberland has not rebutted defendant's explanation that it was necessary to rework the road surface. During trial, defendant recalculated the quantity to be 2,514 tons and the offset was dropped to $5,706.78. That amount was calculated by subtracting from the aggregate for which Timberland was paid (21,000 tons) the amount for which it should have been paid, according to defendant (18,486 tons).

■ Timberland responds in two ways. First it claims that it should be entitled to its own offset for quantities of different varieties of aggregate or asphalt mix which were overstocked, and for which Timberland never was paid. The court rejects that argument. Payne's calculations do in fact credit Timberland with excess Crushed

---

**11.** Timberland's contention that the daily amount of liquidated damages is unreasonable is without merit. The amount was taken from a sliding scale issued by the Federal Highway Administration in its standard specifications for construction of roads and bridges, and is $125 per day less than the amount suggested there. Nor is there an inconsistency between allowance of liquidated damages and defendants offset for the crushed aggregate base. The contract liquidated damages provision refers to delay. The contract also allows for defendant to offset "claims" it has, in the event of termination for default. Timberland presumably would have had to replace the aggregate if it had continued work, or it would have had the amount deducted if the defendant had replaced it. This suggests that the offset for the aggregate is more in the nature of a recoupment to correct an imbalance in an account for sale of materials. The liquidated damages as compensation for the untimely performance serve a different, non-overlapping function. *See Sorensen v. United States,* 51 Ct.Cl. 69 (1916).

Aggregate Base, Grading A which was left behind by plaintiff but for which it was not paid. Moreover, the court declines to give a further credit to plaintiff for other types of materials which may have been overstockpiled. While Timberland may have been able at some earlier point to make a claim for those materials, it has not previously done so. In addition, those materials were not the ones specifically used to repair the road surface. Plaintiff's second argument is that defendant's offset should be rejected because a staking error by defendant lead to over excavation of the road surface by Sime. Timberland overlooks, however, the fact that the regrading survey was prompted by defendant's desire to repair damage to the road surface caused by plaintiff. In other words, while Sime initially overexcavated, and then had to back fill again, the materials for which Timberland is being assessed would have been required with or without an overexcavation.

Defendant is entitled to an additional offset of $5706.78. Timberland is thus entitled to $3,775.56. ($36,152.34 less $21,375, less $5,295,[12] less $5,706.78). Interest on this and other items will be separately discussed.

## 2. *Increased haul and place contract*

■ It cost Timberland $19,391.94 more to have Yakima do the hauling and placing than it would have cost if North Central had performed. The North Central subcontract called for payment at $2.80 per cubic yard of material. Yakima charged $4.01. Timberland argues that this increased cost should be borne by the Government because the change in subcontractors was precipitated by the safety-related delay. The court disagrees for the reasons set out at pages 142–46, *ante*, although it adds that even if there had been a serious safety problem, it had no bearing on North Cen-

tral's failure to show up and Morgan's failure to proceed.

## 3. *Engineering consulting fees*

■ Timberland seeks recovery of $2,392.40 it spent on hiring the engineering consulting services of Andreotti and Associates. That claim is denied. Timberland agreed to a fixed price, and it has not demonstrated that changed conditions, or change orders, or defective design warranted resort to engineering consultants. The proposal to redesign the slope was not requested by defendant, and the suggestion that a bench be permanently left in the bluff was inconsistent with the contract requirements. Since the court has found that it was possible to complete the work as specified, there is no legal support for the claim.

■ As part of its final claim and demand for payment, Timberland sought recovery of $7,752.28 paid by Third party American Insurance Company to CH2M Hill, the engineering consulting firm hired when American was considering the Government's tender of completion of the project. This amount had not appeared in any previous claims or settlement proposals. The CO denied the claim on the ground that the firm's services were provided after termination and were part of its bonding obligation. He also noted that two of Timberland's and American's witnesses at trial were employees of CH2M Hill.

■ Initially, the court rejects the CO's rationale. Under the August 1985 opinion, the default termination becomes a nullity. Consequently the tender to the bonding company was improper and unnecessarily caused expense. The two invoices submitted, moreover, cover a period of time directly associated with consideration of a takeover, and do not relate to litigation. The claim fails, however, for two reasons. As to Timberland, it fails for lack of proof

---

**12.** On two occasions defendant deducted amounts for road maintenance in a total amount of $5295. Defendant made the deduction because Timberland was contractually obligated to maintain the road, and, in defendant's view, the work was not properly done despite

requests. The opinion of August 20, 1985 found plaintiff's position non-meritorious, and plaintiff no longer asserts the amount was improperly offset. In any event, the evidence supports defendant.

that Timberland ever paid these costs. For aught that appears, if payment was made, it was made by American, or perhaps by its law firm. There is no suggestion that Timberland has any liability for this amount. As to American, the claim fails because the Third Party has never submitted a claim for this amount and in any event has not sought affirmative relief in this action. Its pleadings have merely been defensive.

### 4. *Bond premium*

The opinion of October 22, 1987 allowed this part of the claim. Timberland is entitled to recover $6,655.14.

### 5. *Overhead recovery on materials costs paid*

 Timberland seeks $22,197.10 as overhead on materials costs for which it is being paid on a unit basis, *i.e.*, without overhead added on. Defendant does not contest the overhead percentage (7.2%), but the CO decision reduces the amount of materials for which payment was made to reflect the use of 4,803 tons of Crushed Aggregate, Base A, to replace aggregate contaminated by Morgan's method of stockpiling loose rock. The court accepted defendant's assertion in discussing item 1.d. above, and consistency requires similar treatment here. Accordingly, Timberland is entitled to overhead of $21,786.20.

### 6. *Subcontractor claims*

#### a. Morgan

Timberland amended downward slightly its previous claim with respect to amounts paid to Morgan as a result of litigation. The present claim is for $47,101.73, which consists of amounts paid for Morgan's excavation as determined by judgment, and $21,129.65 for Timberland's attorney fees. The CO initially rejected the amount originally claimed, except insofar as he allowed payment for some of the unclassified excavation elsewhere in his decision. At trial, however, the defendant changed its position and agreed to pay the entire amount presently claimed. It is not clear to the court why the Government is willing to concede the litigation-related aspects of the

claim, but will not second guess the decision to pay the amount in full. Accordingly, Timberland is entitled to $47,101.73, along with overhead of 7.2 percent, for a total amount of $50,493.05.

#### b. Yakima Indian Nation

 Timberland has been sued by Yakima for work under its subcontract to do hauling and other work. The amount claimed is $25,427.20. No judgment has been entered in that action, thus the claim is in the same posture as on October 22, 1987, when this court held that Timberland could not, under the contract, recover any contingent amount. The claim is denied without prejudice to timely resubmission to the CO and to this court when liability, if any, is fixed.

### 7. *Additional measured unclassified excavation*

Timberland claims $16,643.20 for additional measured unclassified excavation, and $6,114.50 for unclassified excavation loosely piled, and culvert pipe. The latter figure includes overhead. Defendant does not contest these amounts. Accordingly, Timberland is entitled to $22,757.70 on this claim.

### 8. *Contractor profit*

 Timberland seeks profit in the total amount of $42,767.88. This represents an anticipated gross profit rate of 17.25 percent and is applied only to items of recovery which are not paid at an itemized contract rate. The CO denied any recovery for profit, concluding that the plaintiff would have lost money on the contract and that therefore a negative profit, *i.e.*, a loss, of $22,058.72 must be assessed against any amount to which Timberland would otherwise be entitled. The contract makes provision for both approaches, depending on whether plaintiff would have made money on the contract.

The court has very little confidence in the profit figures advanced by Timberland. The claimed profit percentages differ substantially in the various expressions of

plaintiff's claims. In any event, Timberland has not demonstrated that it would have made any profit on the contract. On the contrary, the court finds that plaintiff's calculation is faulty because it assumes that Timberland's costs to complete would have been no more than those anticipated at the time of its bid. The court cannot · accept the premise that the cost assumptions remained static between bid and performance. Given the court's findings that Timberland was not entitled to time extensions, that Timberland bears the responsibility for the stalemate between Morgan and North Central with the attendant increased cost of the Yakima subcontract, and that Timberland still had not developed a plan for excavation by April, 1980, it would be impossible to find that this would have been a money making contract for plaintiff.

Nor, however, is the court prepared to accept defendant's calculations with respect to loss. These figures were changed at trial and Payne testified that other adjustments could have been made. The court notes, moreover, that the CO's profit analysis, as revised by Payne, is based on an assumed stated profit of $117,151.86. In fact, plaintiff's stated assumed profit is $188,607.75. In addition, a key figure in the loss calculation is a $42,000 increase in . asphalt costs. Although the CO decision with attachments was made an exhibit at the court's suggestion, it was admitted with the specific instruction that the decision and its attachments were admitted only as part of the contract administration background, and that if either party wished to rely on the attachments as proof of the accuracy of anything asserted therein, the documents would have to be independently offered. For that reason there is no proof as to what additional cost Timberland would have incurred for asphalt. The court notes finally that defendant's calculation includes a completion cost of liquidated damages for 141 days, based on the assumption that it would have taken Timberland that long to complete. While defendant is correct that any time spent on com-

pletion would be beyond the contract completion period, there is no support for defendant's assumption that it would have taken 141 days to finish. In sum, the items of additional cost which are not subject to question do not clearly exceed Timberland's anticipated profit as measured from the perspective of the time of the bid. The court therefore declines also to assess a negative profit.

9. *Settlement expenses*

█ Plaintiff presently seeks a total of $14,304.40 in settlement expenses.[13] This consists of $11,800 in legal expenses incurred by Timberland in connection with settlement of the termination for convenience, and $2,504.40 in legal expenses incurred by the third party. Defendant does not contest the fees paid by Timberland, and those are allowed. The court agrees with defendant's disallowance of the fees paid by American, however. Those are not amounts incurred by the plaintiff, and plaintiff has no standing to recover them for the bonding company.

10. *Interest*

█ The CDA permits a recovery of interest on recoverable costs from the time a claim is received by the CO. Interest is paid at the rate established by the Secretary of the Treasury pursuant to 41 U.S.C. § 611. In the present case, defendant argues that none of Timberland's successful claims are entitled to interest prior to May 19, 1988, the date of Timberland's "Final Claim". The court agrees with defendant in part.

For Timberland to collect interest on any of the amounts allowed, it has to be able to trace the recoveries to a "claim" which comports with CDA filing requirements. The court will examine in chronological order the plaintiff's requests for payment and determine if they constitute claims, if they meet those requirements, and finally, if they cover any of the amounts allowed in this opinion.

Claims 1 and 2 were mailed on December 13, 1979, and apparently were received on

---

**13.** At trial plaintiff dropped its claim for $2,000 in generalized administrative expenses.

December 17. They were not certified. Claim 1 can be ignored, since it relates exclusively to government road maintenance expenses. Timberland was unsuccessful in recouping that amount. Claim 2 was for return of $10,450 in retainages held as liquidated damages. After submission of this claim, the amount of retainage ultimately went to $36,152.34. Timberland was partially successful on this claim, having been allowed $3,775.56. Defendant argues that Claims 1, 2 and 3 ($250,000) should be considered as a single claim, and that Claim 2 should therefore not earn interest since it was not certified. The court rejects that analysis. Timberland was entitled in December 1979 to seek the amount it believed was then due. That amount did not trigger the certification requirement. 41 U.S.C. § 605. The fact that the retainage claim increased over time does not mean the original claim had to be certified, *see Contract Cleaning Maintenance v. United States*, 811 F.2d 586 (Fed.Cir.1987); *J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 54–55 (1983), and in any event retainage never exceeded $50,000. Claim 3 was not submitted until July 23, 1982, after the termination for default. Defendant does not persuade the court that the 1979 claims should have anticipated amounts claimed in 1982 under very different circumstances. The relationship between the claims is not sufficiently close. The $3,775.56 recovery thus earns interest at the CDA rate from December 17, 1979.

■ Claim 3 was submitted on July 18, 1982, and apparently was received on July 23. Although it is certified, it is an undifferentiated claim for $250,000 for costs associated with an alleged improper termination for default. After reciting the circumstances leading to the termination, the claim concludes that Timberland had suffered "general and special damages" then thought to exceed $250,000. This submission is not sufficiently specific to satisfy the requirements of 41 U.S.C. § 605(c)(1). *See Tecom, Inc. v. United States*, 732 F.2d 935, 936 (Fed.Cir.1984); *Z.A.N. Co. v. United States*, 6 Cl.Ct. 298, 304 (1984). There is no particularity of claims or itemization of costs. Nor is the lack of specificity cured by subsequent correspondence or discovery after commencement of litigation. *See Thoen v. United States*, 765 F.2d 1110, 1116 (Fed.Cir.1985); *W.H. Moseley Co. v. United States*, 230 Ct.Cl. 405, 677 F.2d 850, *cert. denied*, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982). The court concludes that Claim 3 did not trigger the time from which interest runs.

■ Timberland ultimately submitted three termination cost settlement proposals or claims. Defendant argues that the first two (January 10, 1986 and June 24, 1986) are not "claims" within the meaning of the CDA since they were proposals and presumably therefore not in dispute,[14] but merely a basis for possible negotiation. *See Hoffman Constr. Co. v. United States*, 7 Cl.Ct. 518, 522–23 (1985). That description does not fit the present facts, however. By the time Judge Wood remanded the case to the CO for resolution of termination for convenience costs there was unquestionably a dispute. There cannot have been any uncertainty that a CO determination was required. *Cf. Mayfair Constr. Co. v. United States*, 841 F.2d 1576, 1578 (Fed.Cir.1988) (contract provision defined CDA claim to be a "dispute"). What was missing, however, was a certification. Certification is a separate requirement, *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 16, 673 F.2d 352, 355 (1982), which was not satisfied until the "final claim" was submitted on May 19, 1988.

Consequently, all amounts allowed under this opinion other than net[15] retainage earn interest at the CDA rate from May 23, 1988, the day the final claim was received by the CO. The retainage claim accumulates interest from December 17, 1979.

### CONCLUSION

The court rules as follows on Timberland's claims:

---

**14.** Although the contract does not define what constitutes a claim, is does set up a mechanism for submission of "disputes" to the CO.

**15.** Timberland's entitlement to interest on retainage is calculated on the net amount after defendant's offsets.

1. Contract earnings $3,775.56
2. Increased haul and place contract No recovery
3. Engineering consulting fees No recovery
4. Bond premium $6,655.14
5. Overhead on materials costs $21,786.20
6. Subcontractor claims
 a. Morgan $50,493.05
 b. Yakima No recovery
7. Additional measured unclassified excavation $22,757.70
8. Contractor profit No recovery
9. Settlement expenses $11,800.00

Interest on item 1 accumulates from December 17, 1979. Interest on items 4, 5, 6, 7, and 9 accumulates from May 23, 1988. The Clerk is directed to enter judgment in favor of plaintiff in the amount of $117,-267.65, plus interest as described above pursuant to the Contract Disputes Act. The Clerk is further directed to dismiss the defendant's counterclaim. No costs.

It is so ORDERED.

